Manuel RENTERIA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–05–00590–CR.

Court of Appeals of Texas, Houston (1st Dist.).

July 20, 2006.

Emily Munoz–Detoto, Houston, TX, Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Eric Kugler, Assistant District Attorney of Harris County, Houston, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and BLAND.

## OPINION

JANE BLAND, Justice.

The State charged Manuel Renteria with the felony offense of engaging in organized criminal activity, for which the jury found him guilty. After finding an enhancement paragraph true that Renteria previously had been convicted of a felony offense, the trial court sentenced Renteria to forty-five years' imprisonment. In two issues on appeal, Renteria contends (1) the evidence is legally insufficient to demonstrate either the individual or group *mens rea* required to support his conviction, and (2) the trial court erred in not requiring

the State to elect one paragraph from the indictment on which to proceed. We affirm.

## Background

In June 2002, police officers recovered an abandoned salvage vehicle from a body shop in Fort Bend County, with its Vehicle Identification Number ("VIN") and other identifying information removed. Sergeant Cantu, an investigator for the Motor Vehicle Theft Division of the Texas Department of Public Safety, examined the vehicle, determined its VIN, and discovered that the VIN had recently been re-registered, indicating the VIN probably had been placed on a stolen vehicle that had been sold and registered under the salvage VIN. Cantu and his partner, Sergeant Kucifer, subsequently began investigating a series of similar vehicles, most of them late-'90s Ford or Chevrolet extended-cab step-side trucks. Cantu and Kucifer determined that the vehicles had been purchased at salvage, whereupon their VINs and mylar federal safety stickers were removed and placed on stolen vehicles. The altered, stolen vehicles were then sold at local flea markets. Cantu and Kucifer visited salvage dealers and compiled lists of the individuals purchasing salvage vehicles. Based on the recurring names on those lists, the investigators created a list of suspects and a list of "target vehicles" that had been purchased at salvage auctions by those suspects. The VIN numbers from those target vehicles later appeared on stolen vehicles. The officers linked the stolen vehicles sold at the flea market to the suspected auto theft ring because the vehicles bore paper license plates with the name "ZM Auto Sales." In addition, many of the vehicles had been registered at AAA Title Services. The investigators ultimately determined that 137 vehicles had been stolen, altered, and sold by Renteria, Jose Nieto, Pius Opondo,

Ezequil Ponce, Jose Adame ("Jose"), Angel Adame ("Angel"), Francisco Barrera, and Hugo Rodriguez, who the State tried at the same time as Renteria.

At trial, Bernardo Zuniga testified that he purchased a 1997 Ford step-side pickup truck from Ponce at the flea market in May 2002. The truck was stolen. Zuniga later identified Ponce from a photo line-up and in court. Armando Garcia testified that he purchased a 1997 extended-cab Ford truck, later determined to be stolen, from Rodriguez at the flea market. Rene Sanchez testified that Rodriguez sold him a stolen black Ford truck at a flea market in April 2002, and that Renteria later traded a stolen Chevrolet truck for a Ford truck with Sanchez's brother, Cerillo. Cerillo Sanchez testified that Renteria sold him a stolen red step-side truck at the flea market in April 2002. Police officers observed Aldo Perez at the flea market attempting to sell one of the vehicles associated with the investigation. Alfredo Saucedo testified that he purchased an extended-cab step-side Ford truck, later determined to be stolen, that he had seen at the flea market from Renteria in March 2002. He later traded the truck back to Renteria for another stolen truck.

Another witness informed investigators that Nieto had sold him a stolen vehicle. Investigators discovered a "ZM Auto Sales" tag on that vehicle. When investigators went to Nieto's address, they discovered another stolen vehicle for sale in the driveway. The investigators arrested Nieto and obtained consent to search his house. In his house, they discovered a Ford ignition switch and a registration receipt for yet another stolen vehicle. They also discovered a driver's license and credit card belonging to Yolanda Brignac, whose vehicle had been stolen and linked to this particular auto theft ring. Brignac testified that her extended-cab side-step

Ford truck was stolen in July 2002, and that her purse was in the truck when it was stolen.

The State charged Filomeno Adame ("Filomeno") with stealing four of the vehicles associated with the ring. Filomeno had a relationship with Renteria's daughter, and he helped Renteria sell stolen trucks. Renteria gave him the trucks to take to the flea market, and would pay him $300 to sell the trucks. Renteria instructed Filomeno to refer purchasers to AAA Title Services. Filomeno also helped Renteria clean the trucks to prepare them for sale at a house on Heatherbrook. Filomeno testified that his brother Angel lived in the house, but Angel decided to move, and Renteria offered to continue to pay the rent so Renteria could work on the trucks there. In all, Filomeno helped Renteria sell ten trucks. Filomeno saw Renteria remove VINs from the vehicles and replace them with different VINs. Filomeno pled guilty to theft in April 2003. He cooperated with prosecutors in exchange for a lighter sentence.

Eva Renteria, Renteria's daughter, testified that her father was unhappy when he discovered that she was dating Filomeno, who was married. When Filomeno was in jail for theft charges, Filomeno called her often asking questions about Rodriguez and Renteria. She testified that Filomeno hated her father, and had accused her of cheating on him with Rodriguez. She further testified that Filomeno was living with his brother, Angel, and that the two of them drove different trucks every week.

Alfredo Ramiro owned Bronco's Auto Sales. A licensed salvage dealer, he purchased salvage vehicles on behalf of members of the auto theft ring. Ramiro bought cars from salvage auctions, repaired them in his salvage shop, and sold them. Ramiro testified that Renteria approached him and told him that he bought many trucks, and inquired if Ramiro could buy some salvage trucks for him. Renteria visited the auction yard the day before the auction, and then told Ramiro which vehicles he wanted to purchase. Renteria paid Ramiro for purchasing the vehicles for him. Ramiro estimated that he bought thirty vehicles for Renteria at the salvage auction. Renteria paid him one hundred dollars per vehicle. Renteria introduced Ramiro to Rodriguez, and told him that Rodriguez would attend the auctions and would tell him how much to bid for the trucks they wanted to purchase. Ramiro saw Rodriguez, Renteria, Nieto, and Angel together at the auctions. He purchased vehicles for all of them on occasion because he believed them to be part of the same group.

Cantu and Kucifer testified that forty-three of the salvage vehicles whose VINs had been found on stolen vehicles were towed to a salvage yard in Wallis, Texas and abandoned. Charles Spates testified that Rodriguez paid him a couple of hundred dollars to store between two and four vehicles temporarily on his property, and made an arrangement thereafter for wrecker drivers to deliver and store other vehicles on Spates's property. Spates testified that around forty vehicles were stored on his property by Rodriguez's associates. Cantu testified that investigators found these vehicles on the Spates property with their VINs removed.

Cantu and Kucifer received an anonymous tip that illegal activity related to the auto theft ring had occurred at the residence on Heatherbrook. Cantu and Kucifer obtained a search warrant and searched the home. In the nearly empty home, they discovered a stack of "ZM Auto Sales" tags, as well as two stolen Ford trucks for sale in the driveway, bearing "ZM Auto Sales" tags, and a hair dryer. Both testified that thieves com-

monly use hair dryers to heat mylar stickers to easily remove them. They also discovered white spray paint, which Kucifer testified thieves commonly use as an adhesive to reapply mylar stickers because it disguises the "void" message that appears when mylar stickers initially are removed. In addition, they discovered license plates belonging to several vehicles reported stolen that had not been recovered. The house was rented under the name of Angel Adame.

Investigators conducted surveillance of Ponce's residence on Ruellen. While observing the residence, Rodriguez drove up, exited his car, had a brief conversation with Ponce, and left. Kucifer followed Rodriguez, and determined that the Ford truck he was driving was stolen. Police later found that vehicle in Wichita, Kansas—the same city where they ultimately apprehended Renteria.

Renteria testified that he did not know the vehicles he had sold at the flea market to Sanchez and Saucedo were stolen, but that he had obtained those vehicles from Romero and Nieto. He testified that he sold a couple of trucks for the two of them and that in June 2002 he began asking questions because they had marketed the trucks for low amounts. He testified that he did not receive satisfactory answers, so he stopped selling trucks for them. Renteria testified that he disliked Filomeno and never worked with him selling trucks. Renteria denied knowing Rodriguez or ever speaking to him. Renteria denied ever going to the house on Heatherbrook. Renteria testified that he did not have a license to buy and sell vehicles and that he never paid taxes on the profits of the vehicles he sold.

Investigators discovered a fingerprint on the back of a mylar sticker that had been removed from a salvage vehicle and placed on one of the stolen vehicles. Fingerprint expert Todd McCrohan testified that he removed the fingerprint from the mylar sticker, compared it to a known fingerprint in the fingerprint database and to a fingerprint taken from Renteria in the courtroom, and determined that the fingerprint on the mylar sticker belongs to Renteria. McCrohan also testified that he identified one of Rodriguez's fingerprints on another mylar sticker. Cantu testified that someone's fingerprint could appear on the back of a mylar sticker only if that person had removed the sticker and handled it in some way.

The investigators did not witness any criminal activity at Renteria's residence. Kucifer also testified that no direct link existed between Renteria and the house on Heatherbrook. Kucifer conceded that he had not produced any evidence that Renteria actually had stolen any of the twelve vehicles that he discussed in detail at the trial. Kucifer testified that Ramiro told investigators he purchased salvage vehicles for Renteria. Kucifer and Cantu both testified that auto theft rings involve much more than merely stealing and selling the cars, such as alteration of the stolen cars and procurement and disposal of the salvage vehicles.

## Legal Sufficiency

In his first issue, Renteria contends the evidence is legally insufficient to demonstrate (1) that he intended to participate in a criminal combination, and (2) that the group agreed to participate in a continuing course of criminal activity.

### Standard of Review

When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Drichas v. State,* 175 S.W.3d 795, 798 (Tex.Crim.App.2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim.App.1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App.1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex. Crim.App.1991). Instead, our duty is to determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *See Adelman,* 828 S.W.2d at 421–22. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson,* 819 S.W.2d at 843.

*Engaging in Organized Criminal Activity*

■ A person engages in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, ... he commits or conspires to commit" one of several enumerated offenses, including theft. TEX. PEN.CODE ANN. § 71.02(a)(1) (Vernon Supp.2005). The State has the burden of proving the combination. *Hart v. State,* 89 S.W.3d 61, 63 (Tex.Crim.App.2002). A "combination" requires three or more people who collaborate in carrying on criminal activities. TEX. PEN.CODE ANN. § 71.01(a) (Vernon 2003). The State must prove (1) that the defendant intended to establish, maintain, participate in, or participate in the profits of a combination, and (2) that the members of the combination intended to work together in a continuing course of criminal activity. *Hart,* 89 S.W.3d at 63; *Dowdle v. State,* 11 S.W.3d 233, 236 (Tex.Crim.App. 2000). Participants in the combination need not know each other's identity, and

membership in the combination may change. TEX. PEN.CODE ANN. § 71.01(a)(1)-(2). However, there must be evidence of an agreement to act together in a continuing course of criminal activity. *Nguyen v. State,* 1 S.W.3d 694, 697 (Tex.Crim.App. 1999). Similar methods of operation, together with joint activities and relationships, support the finding of a single conspiracy. *McGee v. State,* 909 S.W.2d 516, 518 (Tex.App.-Tyler 1995, pet. ref'd). A jury may infer criminal intent from any facts that tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime. *Manrique v. State,* 994 S.W.2d 640, 649 (Tex.Crim.App.1999).

■ Here, the jury charge included an instruction on the law of parties. A person is "criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PEN.CODE ANN. § 7.01(a) (Vernon 2003). A person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b). To prove the offense of engaging in organized criminal activity as a party, the State must also prove that the defendant had the mental state required for commission of the underlying offense. *Hart,* 89 S.W.3d at 63. The underlying offense charged in this case was theft. Theft is committed when a person "unlawfully appropriates property with intent to deprive the owner of property." TEX. PEN.CODE ANN. § 31.03(a) (Vernon Supp.2005).

*Renteria's* Mens Rea

■ Renteria first contends the evidence is legally insufficient to demonstrate that he intended to participate in a criminal combination. Cerillo Sanchez and Alfredo Saucedo testified that Renteria sold them stolen vehicles at the flea market sometime in 2002. Renteria admitted to having sold trucks at a flea market in 2002, and specifically to having sold a truck to Saucedo. Renteria contends, however, that he did not know the vehicles were stolen when he sold them, and that he therefore lacked the intent necessary to support his conviction. Renteria contends this case is similar to *Munoz v. State*, in which the Amarillo Court of Appeals reversed a conviction for engaging in organized crime because the evidence indicated that Munoz was involved in one drug transaction, but was legally insufficient to demonstrate that he intended to participate in an ongoing course of criminal activity. 29 S.W.3d 205, 210 (Tex.App.-Amarillo 2000, no pet.). This case is distinguishable, however, because here, evidence exists from which a reasonable jury could infer that Renteria intended to engage in an ongoing course of criminal activity.

The State presented evidence that Renteria purchased around thirty salvage vehicles from Ramiro and that the VINs from those vehicles were later discovered attached to stolen vehicles that had been sold at the flea market. Filomeno testified that he worked for Renteria for one month cleaning and selling vehicles at the flea market and that he witnessed Renteria removing VINs from some of those vehicles. Filomeno also testified that Renteria paid rent and worked out of the house on Heatherbrook where Kucifer and Cantu discovered tools, hair dryers, and paint cans, all associated with VIN switching. In addition, Renteria's fingerprint was found on the back of a mylar sticker that had been removed from a salvage vehicle and placed on a stolen vehicle. Kucifer testified that a person's fingerprint could show up on the back of such a sticker only if the person had removed and handled the sticker in some way. Viewed in the light most favorable to the verdict, we hold that this evidence is legally sufficient for a rational jury to have concluded that Renteria intended to, and did, participate in a combination that collaborated in carrying on criminal activities through stealing, altering, and selling vehicles.

*Group* Mens Rea

■ Renteria further contends the evidence is legally insufficient to demonstrate that the alleged members of the combination intended to engage in a continuing course of criminal activity. *See Nguyen*, 1 S.W.3d at 697. Renteria's indictment identifies the alleged members of the combination as Renteria, Rodriguez, Opondo, Barrera, Ponce, Aragon, Jose Adame, Angel Adame, and Nieto. Renteria contends Nieto, Angel Adame, Rodriguez, Filomeno, and Renteria were the only individuals discussed with enough specificity at trial to have arguably been members of the combination, and thus the State failed to prove the combination as alleged. Texas Penal Code section 71.01(a) requires the participation of three individuals to prove a combination, so the State must prove three of the individuals named in the indictment committed or conspired to commit theft as part of an ongoing course of criminal activity. *See* TEX. PENAL CODE ANN. § 71.01(a). Thus, evidence linking at least two of the named co-conspirators and Renteria to the auto theft ring is sufficient to support Renteria's conviction under the statute. *Id.; see Fuller v. State*, 73 S.W.3d 250, 252, 254 (Tex.Crim.App.2002) (federal constitutional law measures evidentiary sufficiency against the "elements of the crimi-

nal offense as defined by state law," and state law measures evidentiary sufficiency against an "authorized by the indictment ... hypothetically correct jury charge" that "encompasses [the] statutory elements of the offense as modified by the charging instrument").

Kucifer and Cantu linked 136 vehicles— all trucks with similar descriptions—to the auto theft ring. The vehicles were stolen, altered, and discovered within a two-year period spanning 2001 to 2003. The investigators testified that by information obtained through creating lists of individuals who had purchased salvage vehicles, interviewing the purchasers of the stolen vehicles, and searching the residences of various suspects, they determined that the individuals named in the indictment participated in the auto theft ring.

*1. Nieto*

The purchaser of one of the stolen vehicles told investigators that Nieto had sold him the car. Cantu and Kucifer went to Nieto's house and found a stolen vehicle matching the description of those involved in the auto theft ring for sale in his driveway. Cantu and Kucifer searched Nieto's house and discovered a Ford ignition switch, a registration receipt for another stolen vehicle, and the driver's license of the owner of yet another stolen vehicle. Ramiro testified that he began purchasing salvage vehicles for Nieto after he saw Nieto conversing with Renteria and Rodriguez at the auctions and determined they were all part of a group. Viewed in a light most favorable to the verdict, we hold that this evidence is sufficient to demonstrate Nieto's involvement in the combination.

*2. Rodriguez*

Ramiro testified that he purchased about thirty salvage vehicles for Renteria and Rodriguez. Spates testified that Rodriguez paid him $100 to store three or four salvage vehicles in his junkyard. Kucifer and Cantu testified that they discovered on Spates's property forty-three salvage vehicles whose VINs had been removed and reattached to stolen vehicles associated with the combination. Filomeno testified that he cleaned vehicles for Renteria and Rodriguez at a residence on Heatherbrook, and witnessed Renteria and Rodriguez removing VINs from vehicles while cleaning cars at that residence. Cantu and Kucifer testified that they searched the Heatherbrook residence and discovered tools, a hair dryer, and spray paint, all of which they believed, based on their experience, would commonly be used to remove and reattach VINs and mylar stickers. Kucifer and Cantu testified that while conducting surveillance on Ponce's house, they observed Rodriguez arrive in a stolen vehicle associated with the auto theft ring, have a brief conversation with Ponce, and leave. That stolen vehicle was later recovered in Wichita, Kansas, which is also where police apprehended Renteria. Armando Garcia testified that he purchased a 1997 extended cab Ford truck, later determined to be stolen, from Rodriguez at the flea market. Rene Sanchez testified that Rodriguez sold him a stolen black Ford truck at a flea market in April 2002. Viewed in a light most favorable to the verdict, we hold that this evidence is sufficient to demonstrate Rodriguez's involvement in the combination.

*3. Angel*

Filomeno testified that his brother Angel used to live in the house on Heatherbrook, but that when Angel decided to move, Renteria offered to continue to pay the rent so Renteria could prepare stolen trucks for sale there. When Kucifer and Cantu searched the house on Heatherbrook, it was still rented under Angel's name, and investigators discovered mail there bearing Angel's name. Ramiro tes-

tified that he saw Rodriguez, Renteria, Nieto, and Angel together at the auctions, and that he purchased vehicles for all of them on occasion because he believed them to be part of the same group. Eva Renteria testified that she saw Filomeno and Angel driving different trucks every week. Viewed in a light most favorable to the verdict, we hold that this evidence is sufficient to demonstrate Angel's involvement in the combination.

### 4. Renteria

Filomeno testified that Renteria paid him to sell about ten trucks at the flea market over a period of about one month. He also testified that he helped Renteria and Rodriguez clean the trucks to prepare them for sale at the house on Heatherbrook where Angel used to live, but where Renteria had begun paying rent. Cantu and Kucifer testified that they searched the Heatherbrook residence and discovered tools, a hair dryer, and spray paint, all of which they believed, based on their experience, would commonly be used to remove and reattach VINs and mylar stickers. Filomeno testified that he saw Renteria and Rodriguez removing VINs from vehicles while cleaning cars at that residence. Ramiro testified that he purchased about thirty salvage vehicles for Renteria and Rodriguez at auction. Ramiro later identified Renteria, Rodriguez, Angel, and Nieto out of a photo line-up.

We hold that this evidence is legally sufficient to show that, at the very least, Renteria, Rodriguez, Angel, and Nieto worked together in an ongoing course of criminal activity.

### Election

■ In his second issue, Renteria contends the trial court erred in denying his request to require the State to elect a single paragraph in the charge on which to proceed. The indictment in this case charges that Renteria,

> on or about various dates between April 26, 2001 and April 21, 2003, pursuant to one scheme and continuing course of conduct, did then and there unlawfully, with intent to establish, maintain, and/or participate in a combination and in the profits of a combination . . . commit the offense of theft by acquiring or otherwise exercising control over property with the intent to deprive the owner of that property, and the total value of the property was over two hundred thousand dollars.

The next paragraph of the indictment alleges that, "as part of the above identified combination, the Defendant acquired or otherwise exercised control over 136 motor vehicles," and the final paragraph alleges that, "as part of the above-identified combination, the Defendant acquired or otherwise exercised control over money." The State contends the two allegations, theft of motor vehicles and theft of money, are two separate means of committing the same offense—organized criminal activity—and do not constitute two separate offenses requiring an election by the State. We agree.

■ Upon a timely motion by the defendant, the State is required to make an election of those alleged acts upon which it will rely to pursue a conviction. *Gutierrez v. State*, 8 S.W.3d 739, 748 (Tex. App.-Austin 1999, no pet.). This election requirement only applies, however, if an indictment alleges a single offense and the proof at trial shows the alleged offense occurred more than once. *See Scoggan v. State*, 799 S.W.2d 679, 680 n. 3 (Tex.Crim. App.1990); *Moore v. State*, 143 S.W.3d 305, 312 (Tex.App.-Waco 2004, no pet.). The State is not required to elect between separate manners and means of committing the same offense. *Rodriguez v. State*,

970 S.W.2d 66, 69 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd) ("The State may plead all three forms of delivery [of cocaine] and it may not be forced to elect a particular method on which to prosecute."); *Braughton v. State*, 749 S.W.2d 528, 530 (Tex.App.-Corpus Christi 1988, pet. ref'd) ("The State need not elect between various theories alleged and the jury may consider all theories and return a general verdict of guilty.").

Renteria relies on *O'Neal v. State*, for the proposition that "once the State rests its case in chief, in the face of a timely request by the defendant, the trial court *must* order the State to make its election. 746 S.W.2d 769, 772 (Tex.Crim.App.1988). Failure to do so constitutes error." This court considered an argument similar to Renteria's in *Renfro v. State*, 827 S.W.2d 532, 535–36 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). In that case, Renfro was charged with engaging in organized criminal activity by collaborating with other individuals to commit "theft of vehicles, heavy equipment, and money." *Id.* at 535. In eight separate paragraphs, the indictment alleged eight incidents involving theft of heavy equipment and vehicles, each involving Renfro and various members of the group. *Id.* Renfro argued that the jury charge, which contained the same eight paragraphs from the indictment, failed to adequately apprise him of which offense he had been convicted, and with which members of the combination he had allegedly participated. *Id.* We held that "[i]n the indictment, the language 'theft of vehicles, heavy equipment and money' did not allege three different offenses, but simply described the purpose of the combination, i.e., to collaborate in carrying on the criminal activity of theft targeting heavy equipment, vehicles, and money." *Id.* at 536. "The fact that the State alleged in the indictment the three *types* of property targeted to be stolen did not convert the offense of engaging in orga-nized crime to commit theft into three separate offenses." *Id.*

Similarly, here, Renteria was charged with the single offense of engaging in organized criminal activity under section 71.02 by participating in a criminal combination and committing theft. *See* TEX. PEN.CODE ANN. § 71.02(a)(1). The indictment alleged in two paragraphs that Renteria participated in stealing 136 vehicles, and in selling the stolen vehicles to 136 innocent purchasers. The fact that the State alleged two types of theft did not convert the offense of organized crime into two separate offenses. Renteria suggests that because the State alleged two modes of committing the offense, he cannot be sure under which mode—theft of cars or theft of money—the jury found him guilty. However, the Court of Criminal Appeals recently held that while jury unanimity is required on the essential elements of the offense, if the statute in question establishes different modes or means by which the offense may be committed, unanimity is generally not required on the alternate modes or means of commission. *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex.Crim. App.2006). Accordingly, we hold the trial court did not err in denying his request to require the State to elect between the two paragraphs in the indictment.

### Conclusion

We conclude that the evidence is legally sufficient to support Renteria's conviction for engaging in organized criminal activity. We further conclude that the trial court did not err in denying his request to require the State to elect between the two means of committing the crime of engaging in organized criminal activity. We affirm the judgment of the trial court.