

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NOS.  2-08-050-CR
2-08-051-CR

JOE W. DICKSON                                                                APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

Joe W. Dickson appeals his convictions for aggravated sexual assault and aggravated kidnapping.  In nine points, he challenges the factual sufficiency of the evidence to support his convictions, asserts unanimity and double jeopardy violations, and argues that the trial court erred by denying his motion for the State to make an election.  We affirm.

## Background

A grand jury indicted Appellant for the aggravated sexual assault of complainant Ora W. and the aggravated kidnapping of complainant "Adam" (a pseudonym) on or about October 4, 2006. Appellant pleaded not guilty, and the cases were tried to a jury.

Ora testified that in October 2006, she shared a home with her four-year-old nephew, Adam; her two daughters, Beatrice and Carol (both pseudonyms); and Appellant, who had been her boyfriend until a few months earlier. She said that on the morning of October 4, Appellant punched her in the stomach with his fist—causing bruises that were visible in photographs taken a couple of days later and admitted into evidence at trial—and she fell to the ground screaming. Appellant bound her wrists with plastic zip ties and dragged her to the bedroom. According to Ora, when Adam followed them to the bedroom, Appellant pushed him into the closet and said, "Stay in the closet because I don't want you to see me kill your aunt." Ora testified that Appellant then tore her underwear off, laid a shotgun on the bed, threatened her with a knife or box cutter, and attempted to penetrate her anus with his penis. When his attempt failed, Appellant forced her to perform oral sex on him until he ejaculated in her mouth, all while holding the box cutter to her throat.

2

Ora testified that Appellant then told her to "start praying to God to save [her] life soul." Appellant gagged Ora with a shirt and tape, tied her legs with an electrical cord, and told her that if her sister came to the door, he would "blow her head off." After about three hours, Appellant released Ora and told her to take a bath, and she showered while Appellant stood in the bathroom doorway. Ora testified that Appellant told her he was sorry but that he would kill her if she told anyone what he had done. She said that despite his threat, she went to her sister Brenda Jackson's house next door while Appellant remained at home, and Ora told Brenda and Brenda's daughter, Sametra Jackson, what Appellant had done.

Ora and Appellant then went to pick up Beatrice and Carol at school. Ora said that upon their return, she, Appellant, Adam, and Beatrice sat in the garage, which was furnished with a couch. While they were sitting there, a friend of Ora's named Tonya Gilstrap drove up, jumped out of her car, and said, "You mean this mother-f***** still here after what he done to you?" Ora did not see a gun in Tonya's hands. Ora said that she walked toward Tonya while saying that Appellant had not done anything to her because she was afraid Tonya would start a fight with Appellant. Ora then walked into Brenda's house to get away from Appellant while Brenda called for Adam and Beatrice to go to

3

her house, too. She testified that Beatrice grabbed Adam but that Appellant pulled Adam away from her and carried him into Ora and Appellant's house.

Ora said that she then saw Appellant raise his shotgun and start shooting, so she climbed out of a window in Brenda's house, jumped a neighbor's ("Cuttie's") fence, and sought refuge in Cuttie's garage. She heard "quite a few" more gun shots. Eventually, police arrived and evacuated everyone from the area.

Ora's niece Sametra Jackson testified that she; her boyfriend, Rudy Johnson; and her mother, Brenda Jackson, were all in Brenda's house on the day of the incident when Ora came to the house around noon. Ora was jittery and upset. Ora talked to Sametra and the others for fifteen minutes and then returned to her own house. Sametra said she was concerned and afraid for Ora. According to Sametra, after Ora left, Brenda made a telephone call to someone. A short while later, Sametra saw Tonya drive up, get out of her car, and walk up to Ora's house. She did not see a gun in Tonya's hand. When Sametra and Brenda called to the children to get away from Ora's house; Beatrice ran off down the street, and Sametra chased after her. Sametra said she then heard a gunshot and ran into Cuttie's house. She heard more gun shots but did not see who was shooting and did not see anyone get hit by gunfire. She later saw gunshot wounds on Cuttie, Tonya, and Rudy. She said

4

Rudy lost his right eye and two teeth and still has buckshot embedded in his chest.

Brenda Jackson testified that after Ora told her and Sametra what Appellant had done to her, she called Tonya Gilstrap and told her what Ora had said. Tonya drove up five or ten minutes later, got out of her car, and spoke to Appellant, who was sitting in his garage with the garage door open. She did not see a gun in Tonya's hands. Brenda testified that she yelled to Appellant, "You wrong for what you did," and called Adam and Beatrice to come to her because she was concerned about what Appellant might do when he found out Brenda and Tonya knew what he had done to Ora. She said that Beatrice came out of the garage, and Appellant grabbed Adam and took him inside the house. Brenda ran into her own house. She then heard several gunshots. Brenda testified that Rudy was hit with gunfire and that Tonya, after helping to move Rudy into Brenda's house, went back outside and got shot, too. Brenda called 911; after listening to the 911 tape, she testified that she called 911 before the shooting started. Police eventually evacuated her and the other people in her house. She did not see Adam again until around 7:00 a.m. the following day.

Rudy Johnson testified that when Tonya drove up, she jumped out of her car and screamed at Appellant. Rudy did not see anything in Tonya's hands. Rudy told Tonya to calm down and told Adam and Beatrice to come out of the

5

garage. Beatrice ran down the street, and Appellant grabbed Adam. Rudy testified that he and Tonya tried to rescue Adam from Appellant, but Appellant ran inside the house with Adam and closed the door. Rudy saw a cell phone on the floor of Appellant's garage, picked it up, and called the police as he walked out of the garage. He heard a gunshot fired from a window of Appellant's house and, as he walked toward Brenda's house, a second shot hit him in the face. Rudy took shelter in Brenda's house until the police came and evacuated him from the area.

Kevin "Cuttie" Willis testified that he lived in the house next door to Brenda's; Appellant and Ora lived in the house on the other side of Brenda's. He was sitting in his garage when he saw Tonya drive up, get out of her car, and start "cussing" Appellant, who was in his garage with Ora and some children. He testified that Tonya had a pistol in her hand. He saw Ora come out of the garage and say, "Girl, what [are] you talking about?" Appellant grabbed Adam, and then Tonya and Rudy ran up into Appellant's garage. Cuttie did not see Tonya point her pistol or fire it. Tonya and Rudy came back out of Appellant's garage, and Cuttie saw Rudy get shot. Cuttie said he went into his house to get his own gun, returned to his garage, and fired two shots in the air towards Appellant's house to give the children in the area time to take cover. He saw Tonya come out of Brenda's house and cross the yard to his

6

house; then he and Tonya were both shot.  Cuttie said his friend Ernest Cary, who was also in Cuttie's garage, then grabbed Cuttie's gun and fired additional shots at Appellant's house.  Police later evacuated Cuttie through the back of his property.

Forest Hill Police Detective Demond Spraberry testified that he was dispatched to the scene of the incident.  He said that the Everman Police Department, the Tarrant County Constable's Office, the Fort Worth Police Department and SWAT team, the Burleson SWAT team, and the Mansfield SWAT team all assisted with the incident because the Forest Hill Police Department was not equipped to deal with a hostage situation.  Detective Spraberry and other officers set up a security perimeter around the area and evacuated area homes by taking the residents into a field behind the houses. Detective Spraberry helped evacuate Brenda's house, and he said four people in the house were injured:  Rudy, Tonya, and Cuttie—all of whom had gunshot wounds—and Ora, who had bruises on her stomach, wrists, and ankles.

Mansfield SWAT officer Timothy Wing testified that he and his SWAT team arrived on the scene around 11:20 p.m.  He said that around sunup on the following day, Appellant walked out of his house under a negotiated "surrender plan", and the SWAT team arrested him.  Officer Wing then entered the house

with other members of his team and searched the house until they found Adam, who was scared but unharmed.

Forest Hill crime scene officer Richard Kyle arrived at the scene after Appellant surrendered and the crime scene was secure. During his search of Appellant's house, he found evidence of several shotgun shots fired from inside the house, a shotgun, severed electrical cords, and a pair of torn panties, which Ora identified as the ones she was wearing at the time of the assault.

Mansfield Police Officer Daniel Sherwin testified that he negotiated with Appellant via a telephone the SWAT team tossed into Appellant's house through a window. Appellant told him, "The boy is not coming out." Officer Sherwin eventually developed a surrender plan with Appellant, and Appellant surrendered.

Appellant called Ernest Cary as a witness. Cary testified that he saw a woman drive up and get out of her car with a pistol in her hand. He said that he saw the lady and Rudy run into Appellant's garage and chase Appellant into his house. Cary saw Appellant grab Adam and said he thought Appellant did so to protect himself from Tonya, though he later testified that "[i]t's not like he was holding the baby up . . . so if she shot, the baby would be the first one to get hit. It wasn't [anything] like that." He said Appellant fired the first shot, and he never saw Tonya point or fire her pistol. Cary testified that he fired

8

Cuttie's gun "[s]o that [Appellant would] quit shooting [and they could] get the kids, because there's like kids everywhere."

The jury convicted Appellant of aggravated kidnapping and aggravated sexual assault. After hearing punishment-phase testimony, the jury assessed punishment at seventeen years' confinement on the aggravated kidnapping conviction and eleven years' confinement on the aggravated sexual assault conviction, and the trial court sentenced Appellant accordingly.

**Discussion**

**1. Factual Sufficiency**

In his first three points, Appellant challenges the factual sufficiency of the evidence to support his convictions.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008);

9

*Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

### a. Sexual Assault

In his second point, Appellant argues that the evidence is factually insufficient to support his aggravated sexual assault conviction because Ora's testimony regarding the assault was uncorroborated; her testimony "is self-contradictory on multiple occasions"; and her testimony about her actions following the assault—going to Brenda's house, returning to Appellant's house, and accompanying Appellant to pick up the children at school—is "incredible."

The lack of physical or forensic evidence is merely a factor for the jury to consider in weighing the evidence. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). It is not needed to corroborate the complainant's testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (Vernon 2005); *see also Glockzin v. State*, 220 S.W.3d 140, 148 (Tex. App.—Waco 2007, pet. ref'd) (holding that when victim testified to facts establishing aggravated sexual assault, lack of physical or forensic evidence did not demonstrate factual insufficiency). Further, the physical evidence in this case—the bruises on Ora's abdomen,

wrists, and ankles and the torn panties and severed electrical cords found in her bedroom—did corroborate Ora's account of the assault.

Concerning the alleged inconsistencies in Ora's testimony, a jury is free to believe or disbelieve the testimony of any witness and to reconcile conflicts in the testimony. *Bottenfield v. State*, 77 S.W.3d 349, 355 (Tex. App.—Fort Worth 2002, pet. ref'd), *cert. denied*, 539 U.S. 916 (2003). A jury confronted with conflicting evidence may elect to believe one witness and disbelieve others and may resolve inconsistencies in the testimony of any witness. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997). In this case, the jury resolved any inconsistencies in Ora's testimony against Appellant, and it was free to do so. *See id.* And to the extent that the jury determined that Ora's actions following the assault were not "incredible," as Appellant contends, we cannot say that their determination was against the great weight and preponderance of the evidence. We therefore overrule Appellant's second point.

### b. Kidnapping

In his first point, Appellant argues that the evidence is factually insufficient to support his conviction for aggravated kidnapping because he did not sexually assault Adam, the evidence shows that he did not use Adam as a shield but instead attempted to protect him from the gun-wielding Tonya, and

11

he did not "secrete" Adam because everyone knew Adam was in Appellant's home.

A person commits the offense of aggravated kidnapping if he intentionally or knowingly abducts another person with the intent to use him as a shield or hostage or facilitate the commission of a felony or the flight after the commission of a felony. Tex. Penal Code Ann. § 20.04 (Vernon 2003). "Abduct" means to restrain a person with intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found or using or threatening to use deadly force. *Id.* § 20.01(2) (Vernon Supp. 2008). "Restrain" means to restrict a person's movement without consent, and restraint is "without consent" when accomplished by any means if the victim is a child under fourteen years of age and the parent or guardian has not acquiesced in the confinement. *Id.* § 20.01(1).

The indictment alleged that Appellant

with the intent to use [Adam] as a shield or hostage or facilitate the commission of a felony, to wit: aggravated sexual assault, or to facilitate the flight after the attempt or commission of said felony, intentionally or knowingly abduct[ed] [Adam] by restraining [him] without consent by moving [him] from one place to another or confining [him] with the intent to prevent [Adam's] liberation . . . by using or threatening to use deadly force, namely by shooting a firearm at Rudy Johnson who was trying to rescue [Adam] or by shooting a firearm at Tonya Gilstrap who was trying to rescue [Adam] or by firing a firearm out the window of his home.

12

The court's charge tracked the indictment.

The evidence presented at trial showed that when Tonya confronted Appellant over his sexually assaulting Ora, he grabbed Adam, retreated into his house, and opened fire on Tonya and Rudy with a shotgun. The jury could reasonably believe that Appellant restrained Adam's liberty by using deadly force with the intent to facilitate his flight after having sexually assaulted Ora. Alternatively—if the jury believed that Tonya was holding a pistol when she confronted Appellant—the jury could reasonably conclude that Appellant restrained Adam's liberty by using deadly force with the intent to use Adam as a shield or hostage. The jury could reasonably reach the same conclusion based on the evidence that after shooting Rudy, Tonya, and Cuttie, Appellant barricaded himself in his house for hours and refused to release Adam.

Thus, the State was not required to prove that Appellant intended to or did sexually assault Adam. Nor was the State required to prove that Appellant secreted Adam; the indictment alleged both alternative definitions of "abduct"—secreting or using or threatening to use deadly force—and there was ample evidence that Appellant used deadly force when he fired a shotgun at Rudy, Tonya, and Cuttie.

We cannot say that the evidence supporting the conviction is so weak that the jury's verdict is clearly wrong and manifestly unjust or that the

13

conflicting evidence so greatly outweighs the evidence supporting the conviction that the jury's verdict is manifestly unjust. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. We therefore hold that the evidence is factually sufficient to support Appellant's conviction for aggravated kidnapping, and we overrule Appellant's first point.

### c. Whether Appellant voluntarily released Adam in a safe place

In his third issue, Appellant argues that the greater weight and preponderance of the credible evidence shows that he voluntarily released Adam in a safe place. At the punishment stage of trial, a defendant convicted of aggravated kidnapping may raise the issue as to whether he voluntarily released the victim in a safe place. Tex. Penal Code Ann. § 20.04(d). If the defendant proves the issue by a preponderance of the evidence, the offense is a felony of the second degree, rather than the first degree. *Id*. The burden to demonstrate the safe release lies with the defendant under section 20.04(d). *Teer v. State*, 923 S.W.2d 11, 15 n.4 (Tex. Crim. App. 1996).

When evaluating the factual sufficiency of the evidence offered to support the denial of an affirmative defense, or any fact issue where the law has shifted to the defendant the burden of proof by a preponderance of the evidence, the correct standard of review is whether after considering all of the evidence relevant to the issue, "the judgment is so against the great weight and

14

preponderance of the evidence so as to be manifestly unjust." *Gallo v. State*, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007) (quoting *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990)), *cert. denied*, 128 S. Ct. 2872 (2008).

Appellant requested a punishment-phase jury instruction on voluntary release, which the trial court denied, citing *Brown v. State*, 98 S.W.3d 180 (Tex. Crim. App. 2003). That denial forms the basis of Appellant's fourth point. Upon timely request, an accused is entitled to an affirmative defense instruction on every issue raised by the evidence, whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that it is not entitled to belief. *Warren v. State*, 565 S.W.2d 931, 933–34 (Tex. Crim. App. 1978).

In *Brown*, the court of criminal appeals extensively analyzed the meaning of "voluntarily" under section 20.04(d). 98 S.W.3d 183–88. The court rejected a broad interpretation of "voluntarily" in favor of a narrow interpretation, "such as the absence 'of rescue by the police [or others] or escape by the [kidnap] victim.'" *Id.* at 188 (quoting Model Penal Code § 212.1 cmt. at 233–34) (providing requirement that release be "voluntary" means that "rescue by the police or escape by the victim" will not reduce the punishment level of the offense). "The cases determining when a kidnapper voluntarily

releases the victim in a safe place require the kidnapper to release the victim without any element of rescue or escape." *Cooks v. State*, 169 S.W.3d 288, 291 (Tex. App.—Texarkana 2005, pet. ref'd). When a victim is released or abandoned as a result of police intervention or confrontation, the defendant's conduct likely will not rise to the level of "voluntary release" under section 20.04(d). *See Ballard v. State*, 193 S.W.3d 916, 919 (Tex. Crim. App. 2006) (holding appellant's leaving victim in car with keys did not voluntarily release victim; victim did not escape until police intervened); *LaHood v. State*, 171 S.W.3d 613, 624–25 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (holding defendant not entitled to safe-release instruction when he released victim only after police stopped his vehicle); *Fowler v. State*, 958 S.W.2d 853, 860 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999) (holding defendant did not voluntarily release victim when he surrendered after forty-five-minute standoff with police, leaving victim unharmed in motel room); *Oestrick v. State*, 939 S.W.2d 232, 238–39 (Tex. App.—Austin 1997, pet. ref'd) (holding defendant's abandoning victim in his truck in an attempt to escape after being surrounded by police was not voluntary release). Such circumstances are more analogous to a rescue or escape and will prohibit a finding of voluntary release. *See Brown*, 98 S.W.3d at 188.

16

In this case, Appellant contends that there was some evidence that he voluntarily released Adam. The record does not support his contention. The undisputed evidence shows that Appellant refused to release Adam even when confronted by the police departments and SWAT teams of several municipalities. Appellant continued to hold Adam until hours of negotiation resulted in Appellant's surrender. To say that Appellant voluntarily released Adam would require the broadest possible interpretation of "voluntarily"—an interpretation the court of criminal appeals specifically rejected in *Brown*. *See id.*

We hold that there is no evidence that Appellant voluntarily released Adam. Therefore, the trial court did not err by refusing to give the jury a section 20.04(d) instruction. *See Warren*, 565 S.W.2d at 933–34. And absent any evidence of voluntary release, the judgment is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Gallo*, 239 S.W.3d at 770. We therefore overrule Appellant's third and fourth points.

## 2. Jury Unanimity

In his fifth and sixth points, Appellant argues that he was "denied double jeopardy protection . . . in that he was denied a unanimous verdict" in both cases. Appellant mentions double jeopardy only in the headings for these two

17

issues; his argument focuses solely on jury unanimity and does not explain how he was "denied double jeopardy protection." Therefore, we will analyze his fifth and sixth issues as raising unanimity and not double jeopardy.

Jury unanimity is required in all criminal cases. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). The jury must agree that the defendant committed one specific crime. *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008). That does not mean, however, that the jury must unanimously find that the defendant committed that crime in one specific way or even with one specific act. *Id.* The unanimity requirement is not violated when the jury is instructed on alternative theories, or manner and means, of committing the same offense. *De Los Santos v. State*, 219 S.W.3d 71, 76 (Tex. App.—San Antonio 2006, no pet.); *Cook v. State*, 192 S.W.3d 115, 118 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Texas courts have long held that the State may plead alternate "manner and means" of the commission of the same offense. *See Willis v. State*, 34 Tex. Crim. 148, 149, 29 S.W. 787, 788 (1895). An indictment may contain as many paragraphs as are necessary to allege the various manner and means of committing one alleged offense. *Callins v. State*, 780 S.W.2d 176, 182—83 (Tex. Crim. App. 1986), *cert. denied*, 497 U.S. 1011 (1990). If the statute in question establishes different manner and means by which the offense may be committed, unanimity is

18

generally not required on the alternate manner and means of the offense's commission. *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006).

Appellant argues that "the jury was required to find at least 1 of the following 4 scenarios in order to convict" him of aggravated kidnapping and sets out a page-long list of the different possible "scenarios" the jury could find based on the disjunctive "manner and means" allegations set out in the indictment and repeated in the jury charge. In *Gonzales v. State*, the Amarillo Court of Appeals rejected a similar argument. 270 S.W.3d 282, 288–89 (Tex. App.—Amarillo 2008, pet. ref'd). The *Gonzales* court held that although an indictment for aggravated kidnapping alleged several alternative aggravating factors but alleged only one victim and sought only one conviction for aggravated kidnapping, jury unanimity was not required as to the aggravating factors:

> By virtue of being a result-oriented offense, we conclude that the allowable unit of prosecution for the offense of aggravated kidnapping relates to the abduction of a victim. In other words, the State is allowed to prosecute a person for each victim kidnapped, not for the number of aggravating factors that may be present. In this case, the State alleged one victim and has sought only a single conviction for the offense of aggravated kidnapping, regardless of the number of aggravating factors alleged in Count I. Therefore, the trial court did not err in instructing the jury that it could consider all of the aggravating factors alleged by the State and

19

return a general verdict of guilty for the offense of aggravated kidnapping.

*Id.*

The *Gonzales* court's analysis applies with equal force to our case. The indictment charged several alternative means of committing aggravated kidnapping but sought conviction for a single kidnapping of a single victim. The charge required juror unanimity on the gravamen of the offense, namely, that Appellant abducted Adam with the intent to prevent his liberation; the disjunctive portions of the charge pertain only to the means and manner of committing the offense and the aggravating circumstances. The trial court did not err by submitting the alternative means and aggravating factors to the jury disjunctively, and such submission did not deprive Appellant of a unanimous verdict. *See id.* We overrule Appellant's fifth point.

Appellant's sixth point pertains to his conviction for aggravated sexual assault. His entire argument consists of three sentences in which Appellant contends that "the jury in order to find a conviction had to [wade] through a sea of 'or' (physical force *or* violence, commit *or* threaten, knife *or* gun)."

A person commits sexual assault if the person intentionally or knowingly causes the penetration of the mouth of another person by the sexual organ of the actor without that person's consent. Tex. Penal Code Ann. § 22.011(a)(1)(B) (Vernon Supp. 2008). A sexual assault is without consent

if the actor compels the person to submit or participate by the use of physical force or violence or by threatening to use force or violence and the other person believes that the actor has the present ability to execute the threat. *Id.* § 22.011(b)(1), (2). The same act rises to the level of aggravated assault if the actor uses or exhibits a deadly weapon. *Id.* § 22.021(a)(1)(A)(ii), (2)(A)(iv) (Vernon Supp. 2008).

The indictment alleged that Appellant

did intentionally or knowingly cause the penetration of the mouth of [Ora] by inserting defendant's penis in [Ora's] mouth without the consent of [Ora] by compelling [Ora] to submit or participate by the use of physical force or violence or by threatening to use force or violence against [Ora] and [Ora] believed that the defendant had the present ability to execute said threat, and the defendant used or exhibited a deadly weapon, to-wit: a shotgun, in the course of the same criminal episode.

Paragraph Two: And it is further presented . . . that the defendant did . . . intentionally or knowingly cause the penetration of the mouth of [Ora] by inserting defendant's penis in [Ora's] mouth without the consent of [Ora] by compelling [Ora] to submit or participate by the use of physical force or violence or by threatening to use force or violence against [Ora] and [Ora] believed that the defendant had the present ability to execute said threat, and the defendant used or exhibited a deadly weapon, to-wit: a box cutter, that in the manner of its use or intended use was capable of causing death or serious bodily injury, in the course of the same criminal episode.

The court's charge tracked the indictment. Thus, the indictment alleged that Appellant sexually assaulted Ora by inserting his penis into her mouth and

21

compelled her to submit or participate through (1) the use of force or violence or (2) the threat of force or violence. As the aggravating factor, the indictment alleged that Appellant exhibited or used either (1) a shotgun or (2) a box cutter. The court's charge tracked the language of the indictment.

As with aggravated kidnapping, the charge required juror unanimity on the gravamen of a single offense: Appellant's penetrating Ora's mouth with his penis without Ora's consent. The jury could disagree about the "manner and means" disjunctive elements in the charge—Appellant's mental state, how he overcame Ora's lack of consent, and what deadly weapon Appellant used —but it could convict Appellant only if it unanimously agreed that he committed a single act, namely, that he penetrated Ora's mouth with his penis without her consent, and each juror concluded that at least one of the aggravating factors exists. *See Jefferson*, 189 S.W.3d at 312. Juror unanimity was not required as to which of the aggravating factors exists. *See Landrian*, 268 S.W.3d at 533, 539 ("The jury did not have to be unanimous on the aggravating factors . . . . Because the aggravated-assault statute defines two or more [aggravating] circumstances or factors . . ., the defendant may be convicted if each juror concludes that at least one of the aggravating factors or elements exist."). Thus, the aggravated sexual assault charge did not violate the constitutional unanimity requirement, and we overrule Appellant's sixth issue.

22

**3. Election**

In his seventh and eighth points, Appellant argues that the trial court erred by denying his motion for the State to make an election with regard to both offenses. At the conclusion of the State's case-in-chief, Appellant requested an election as to the "[m]anner and means of commission of the offense" the State intended to rely on for conviction.

Upon a timely motion by the defendant, the State is required to make an election of those alleged acts upon which it will rely to pursue a conviction. *Renteria v.* State, 199 S.W.3d 499, 507 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Gutierrez v. State*, 8 S.W.3d 739, 748 (Tex. App.—Austin 1999, no pet.)). This election requirement applies, however, only if an indictment alleges a single offense and the proof at trial shows the alleged offense occurred more than once. *Id.* (citing *Scoggan v. State*, 799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990); *Moore v. State*, 143 S.W.3d 305, 312 (Tex. App.—Waco 2004, pet. ref'd)). The State is not required to elect between separate manner and means of committing the same offense. *Id.* at 507–08 (citing *Rodriguez v. State*, 970 S.W.2d 66, 69 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) ("The State may plead all three forms of delivery [of cocaine,] and it may not be forced to elect a particular method on which to prosecute."); *Braughton v. State*, 749 S.W.2d 528, 530 (Tex. App.—Corpus

23

Christi 1988, pet. ref'd) ("The State need not elect between various theories alleged and the jury may consider all theories and return a general verdict of guilty."), *cert. denied*, 493 U.S. 870 (1989)).

As we noted in our analysis of Appellant's unanimity points, each indictment alleged a single criminal act but multiple manner and means theories. Because each indictment alleged a single criminal act, the State was not required to elect between the various manner and means theories. *See id.* We overrule Appellant's seventh and eighth issues.

## 4.    Double jeopardy

In his ninth point, Appellant argues that his convictions subjected him to double jeopardy because "in order to be convicted of aggravated kidnapping he was required to also be convicted of aggravated sexual assault, for which he had already been convicted, so that he was twice punished for the same conduct."

The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense.  U.S. Const. amend. V.  Generally, this clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.  *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221,

24

2225 (1977); *Ex parte Herron*, 790 S.W.2d 623, 624 (Tex. Crim. App. 1990) (op. on reh'g).

A defendant has the burden to "preserve, in some fashion," a double jeopardy objection at or before the time that the charge is submitted to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 642 (Tex. Crim. App. 2000). Because of the fundamental nature of double jeopardy, however, a double jeopardy claim may be raised for the first time on appeal when "the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Id.* at 643. When separate theories for an offense are issued to the jury disjunctively, a double jeopardy violation is not clearly apparent on the face of the record if one of the theories charged would not constitute a double jeopardy violation and there is sufficient evidence to support that valid theory. *Langs v. State*, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006). The fact that the jury's verdict *could* have relied on a theory that would violate the Double Jeopardy Clause is not sufficient to show a constitutional violation "clearly apparent on the face of the record." *Id.*

Appellant did not raise his double jeopardy argument in the trial court. Thus, our focus is whether a double jeopardy violation is clearly apparent on the face of the record. *Gonzalez*, 8 S.W.3d at 643. The aggravated kidnapping

25

indictment alleged two alternative aggravating factors: (1) the intent to use Adam as a shield or hostage or (2) the intent to facilitate the commission of or flight after the commission of aggravated sexual assault. We have already held that the evidence is sufficient to support Appellant's conviction under the "shield or hostage" allegation. Thus, a double jeopardy violation is not clearly apparent on the face of the record. *See Langs*, 183 S.W.3d at 687. We therefore overrule Appellant's ninth point.

## Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgments.

PER CURIAM

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 9, 2009

26