**Opinion issued December 15, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00229-CR

———————————

**KELVIN LYNN O'BRIEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1415067**

---

## O P I N I O N

Appellant Kelvin Lynn O'Brien appeals from his felony conviction for engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. § 71.02 (West 2014). Kelvin contends that the jury charge improperly permitted conviction without jury unanimity and improperly instructed the jury regarding an

uncharged method of committing the offense. Kelvin also challenges the trial court's admission of extraneous offenses and the expert testimony of a diamond appraiser. Finally, Kelvin complains that the trial court erred in permitting Kelvin to represent himself mid-trial. We affirm.

## Background

### The Karat 22 heist

On February 6, 2011, Officer M. Santana of the Houston Police Department ("HPD") responded to a call regarding a burglary and theft at a gold and jewelry store named Karat 22 owned by Chitranjan "Aku" Patel, which was located in a strip mall in Houston. When Santana arrived at the store, Aku's daughter, Rachna Patel, showed him that someone had cut through the ceiling of the store and into the room-sized vault that stored the gold and jewelry the store sold and stored for clients. Millions of dollars worth of jewelry and gems had been stolen. The loss exceeded the store's $2.2 million insurance policy limit by at least $2.3 million.

The gold jewelry that Karat 22 sold was unusually pure. Most jewelry stores sell jewelry made of, at most, 18-karat gold, but 22-karat gold is preferred in the South Asian community and Karat 22 caters to South Asian customers. 18-karat gold is about 75 percent pure, while 22-karat gold is 91.6 percent pure.

The thieves deactivated the store's alarm system by disabling the alarm apparatus in the store's attic. Aku, who was home the night of the theft, had

2

checked the store's video feed and determined that all looked normal just before he received a phone call from the alarm company that the alarm was experiencing a communication failure. The alarm routinely experienced communication failures at least four or five times a month, so Aku did not believe that the failure was due to a break-in.

Officer M. Bortmas of the HPD's Burglary and Theft Division investigated the theft. Bortmas testified that the thieves used a grinding tool to cut the lock on the back door and a hole in the roof. Below the hole in the roof was the concrete top of the vault, which had also been cut through using a cut-off wheel. The thieves left behind a number of used and discarded cut-off wheels. Inside the vault, empty jewelry boxes were strewn everywhere, and the only items not taken were several watches that were not made of precious metal. The store had cameras, but the DVRs that recorded the video from the cameras had been damaged by the thieves so that no video was available.

A video recorded by a neighboring store, however, aided HPD's investigation. The video showed a truck parked on the street across from Karat 22 several days before the theft. The truck made an unusual maneuver and then two people exited the truck and walked around the building. Another camera recorded the same truck driving behind Karat 22 and several men loading bags and buckets into the truck beginning at 4:20 a.m. the morning of the theft. Videos from another

3

neighboring store showed the truck's license plate, which law enforcement traced to determine that the truck was registered to Jason Kennedy, who lived in the Dallas/Fort Worth area.

***The leads to Kennedy, John, Derenda, and Kelvin***

Once Kennedy was identified as a suspect, HPD brought the Federal Bureau of Investigation (FBI) into the case. Sergeant F. Quinn of HPD's Major Offenders Division spearheaded the effort to track the purchase of the cut-off wheels that were left behind by the thieves. He worked with Brady Bailey, an organized crime investigator for Home Depot. Quinn asked Bailey to investigate purchases of large numbers of cut-off wheels in Houston and Dallas. Bailey compiled a list of several dozen purchases. But one purchase, made on February 4, 2011—the day before the Karat 22 burglary—stood out. In addition to cut-off wheels, the customer bought gloves, snipping shears that are used to cut wire or light metal, batteries of the type that could be used in a small flashlight or headlamps, and a 20-foot ladder. The customer paid cash, which was unusual for that type of purchase. Bailey found a video of the transaction, showing the purchaser with a jacket, hat, and a distinctive wallet, although the person's face could not be seen on the video. Bailey located another video that showed the same person outside the store, placing the ladder and other items into a box truck. Bailey also found a video of a different transaction involving a person Bailey believed to be the same as in the

4

first video. The person in the third video paid with a credit card registered to John O'Brien, Kelvin's brother.

John and his wife Derenda owned two jewelry and gold-buying stores, New York Gold and Silver Exchange, in the Dallas/Fort Worth area, and Kelvin owned another jewelry and gold-buying store in the same area, New York Gold and Jewelry. Quinn learned that the Internal Revenue Service ("IRS") had assigned two of its special agents, R. Bonham and S. Dawson, to investigate all three individuals as possibly connected to the Karat 22 theft. Agents Bonham and Dawson concluded that the O'Briens were connected to Kennedy when they discovered that a truck wrapped in the New York Gold and Silver Exchange logo was registered to Kennedy.

In July 2011, Quinn traveled to Dallas/Fort Worth and met with Kelvin's wife, Maggie, along with Bonham and Dawson. Maggie voluntarily met with them and signed a consent form permitting law enforcement to search her home. Maggie had also previously given Bonham and Dawson consent to search the home. During that earlier search, the agents seized several appraisals for loose diamonds, several cut-off wheels, and a hand grinder with an attached cut-off wheel designed to cut metal. The agents also found a melted blob of gold on Kelvin's nightstand.

### Kennedy's testimony

Kennedy testified that he had been friends with John for about 12 years and with Kelvin for six or seven years. The three were close friends, and Kennedy helped John renovate the first store that became New York Gold and Silver Exchange.

On Saturday, February 5, 2011, John called Kennedy and told him that they had "some work" to do. Kennedy understood this to mean that they had to break into a jewelry store. Kennedy grabbed some dark clothes and drove his truck to John's. There, they loaded some tools, including grinders, drill bits, and concrete cutters, into the truck, picked up Kelvin, and drove towards Houston. John told them that they were "going to hit Karat 22." John had selected Karat 22 as a target by looking for Indian or Asian jewelry stores in the telephone book, and John and Kennedy had previously cased Karat 22.

The men wore dark clothes and ski masks to avoid being identified on camera and gloves to avoid leaving fingerprints. The men used walkie-talkies to communicate and headlamps so they could see in the dark. They waited for the store and nearby businesses to close. Then, Kelvin went up to the roof to cut a hole and disable the alarm while Kennedy and John acted as lookouts. Kennedy testified that John had previously told him that typically the alarm system is directly below wherever an antenna or satellite dish is on the roof and that you

have to cut the alarm wires and disable the cellular system to prevent the alarm from calling out.

After Kelvin disabled the alarm, the three men waited across the street for about an hour to see if the alarm had been triggered. After confirming it had not, Kelvin and Kennedy climbed back on to the roof of the building, into the attic, and on to the top of the vault, where they spent two to three hours cutting through the vault's concrete top with cut-off wheels. Kelvin entered the vault through the hole they cut and then cut open the vault door.

The vault was full of jewelry. The men gathered the jewelry and put it in trash cans and a shop vac in order to carry it out to the truck. Kennedy estimated that it took them about three hours to empty the vault and that they took everything except for some watches that did not have gold on them; they were focused on items that could be smelted at New York Gold and Silver Exchange's Watauga location. John pulled Kennedy's truck to the back of the store and the men loaded the jewelry into the truck and drove back towards Dallas.

On the drive to Dallas, John called Derenda and asked her to open the Watauga store. John's cell phone records show that he placed two brief calls to Derenda the morning of February 6th, about a half hour before the alarm at the Watauga store was deactivated. Kennedy testified that Derenda met them at the

store, where they unloaded, sorted, and started smelting jewelry to make blocks of gold. Kennedy left after a couple of hours.

Initially, Kelvin gave Kennedy a gold brick as partial compensation for his participation in the heist. Later, John took over responsibility for paying Kennedy and gave him several more gold bricks. Eventually, John told Kennedy that he could not give him any more gold because the FBI was watching them. Kennedy was told that he would be paid about $200,000 for his participation, but only received about $115,000. Kennedy testified that he used some of the money he received to repair his house but spent most of it on methamphetamines. Kennedy did not know that the heist had netted nearly $3 million, and when the FBI told him, he felt that John had not treated him fairly.

Kennedy identified John as the person in the Home Depot video buying the ladder, tools, and gloves. Kennedy testified that he was waiting for John outside the store that day in the box truck shown on the video recorded outside the Home Depot. Kennedy acknowledged that John's construction crane business, where Kennedy sometimes worked, used numerous cut-off wheels weekly.

Kennedy admitted that he has been to jail four or five times. At the time of trial, he had been in the Harris County Jail for two and a half years. Kennedy also admitted that FBI agents told him he could avoid a 20-year federal prison sentence if he cooperated with the state prosecutors. He also admitted that he had

methamphetamines on him the day he was arrested, but he was not charged with possessing drugs and the drugs were thrown away. Kennedy admitted that when he was arrested, he did not immediately confess and originally stated that he did not know anything about the Karat 22 burglary and had never committed any burglaries. Kennedy also admitted that originally, he told the agents that he was the one who cut into the roof and cut the alarm wires, and that John and Kelvin were in the truck.

Kennedy also testified that he helped John and Kelvin burglarize other jewelry stores "about four times," including Nazar's Jewelry in Houston and an unnamed store in Austin. The three used the same methods they used in the Karat 22 theft to steal jewelry from those stores. An FBI agent estimated that the total loss relating to all the burglaries Kennedy committed with John and Kelvin was $19.6 million.

### *The flow of funds after the Karat 22 theft*

Brian Wallace, the owner of Millennium Precious Metals in the Dallas area, testified that Derenda and John had approached him several years before the Karat 22 theft. They told Wallace that they wanted to start up a gold buying business and asked for his advice about what equipment to buy. Derenda and John bought equipment to melt and analyze gold and opened the two locations of New York

Gold and Silver Exchange. The business served as an intermediary to buy gold from small customers with whom Millennium would not typically deal.

On February 7, 2011, John arrived at Millennium with two buckets full of melted gold bars weighing 99 pounds. The gold was 84 percent pure, which put it at a little over 20 karats. A couple of days later, John brought to Millennium another bucket of gold bars weighing approximately 85 pounds. That gold was 80 percent pure, or a little over 19 karats.

Millennium wired $1.699 million for the first batch of gold to the New York Gold and Silver Exchange bank account. Before Millennium was able to wire the second payment, Kelvin showed up at Millennium's office, angry. He was cursing and yelling "Where's my fucking money?" and "I want my fucking money. . . . I want my gold back." He complained that John and Derenda were "in Vegas blowing his fucking money and they weren't answering their phones and they had their phones turned off."

The next day, Kennedy went to Millennium and told Wallace that he was there on behalf of New York Gold and Jewelry, Kelvin's store, to collect the money for the gold that was tendered. Kennedy waited for some time in the waiting room. Wallace wanted Kennedy to leave before Millennium had to ship its gold, so he called a larger company that helps Millennium move its gold and asked them to send some of their undercover policemen. The company sent two men,

who sat down on the waiting-room couch beside Kennedy. One of the men opened his jacket and let his gun show, and Kennedy got up and left.

On cross-examination, Wallace admitted that it is a common practice for his customers to "pool" gold, meaning that they put gold in a pool account and sell it only when the gold market reaches a certain level. He testified that over the course of his business relationship with John and Derenda, he bought gold from them hundreds of times and millions of dollars changed hands. In 2011, Millennium paid New York Gold and Silver Exchange $5.2 million. He acknowledged that New York Gold and Silver Exchange was a legitimate business with strong advertising and a call center to locate customers. He also acknowledged that he almost always interacted with John and had seen Kelvin less than five times and knew that he was newer to the business.

Wallace testified that he did not have any suspicion that the gold John brought to him in February 2011 was stolen. He testified that Millennium had purchased gold in November 2010 from John that was over 81 percent pure, which was a similar degree of purity to the gold purchased in February 2011. Wallace testified that the February 2011 gold did not match the composition of typical 22-karat gold, which is 91.7 percent gold and 8.3 percent copper. The February 2011 gold was only "80-something percent" gold and also contained silver, nickel, zinc,

11

copper, palladium, and platinum. Wallace acknowledged that this mixture could have been comprised of 22-karat gold smelted with other types of jewelry.

Frank Wilson, Vice-President of Group Operations, Central U.S., for Ritchie Brothers Auctioneers, testified that in November 2010, John bid for $1.2 million worth of heavy equipment for his crane business. Typically, Ritchie Brothers requires payment within seven days, but it had difficulty getting payment from John. Ritchie Brothers only received $100,000 from John in November 2010, and would have "collapsed" the sale on February 14, 2011 and placed the items for bid at the next auction. However, on February 10, 2011, John paid the $1.1 million outstanding balance.

Jill Snow, a former employee of Kelvin's New York Gold and Jewelry who was responsible for buying gold and silver, testified that most of the jewelry sold was 14- or 18-karat gold, and the store did not stock gems other than those already set in the jewelry they sold or very small diamonds. According to Snow, the store did much more business buying gold than selling jewelry. She testified that a typical purchase of gold would be in the 10- to 14-karat range and cost the store several hundred dollars, with a purchase occasionally reaching the $1,000 to $2,000 range. When New York Gold and Jewelry purchased a gold item, it would melt it together with other items and take all the melted gold to a refinery weekly, typically Millennium. At most, a week's worth of gold would generate a $10,000

12

payment, about $3,000 of which would be profit. Snow had access to the business's books around the time of the Karat 22 theft, and she testified that the store was losing about $1,500 on a weekly basis.

Snow testified that she found it unusual that Kelvin brought a bag of jewelry and hundreds of loose stones to the store in March 2011. She saw Kelvin sort through the stones and test each one to see if it was real. He also broke apart approximately 10 Rolexes that were in the bag and melted down the gold bands. One of the diamonds in the bag was a flawless 3.5 carat stone, which was unlike anything typically sold in the store. Snow asked Kelvin where he got the jewelry and Kelvin got mad. He told her that he bought it at an estate sale and then said, "You know, for all I know, this stuff could be stolen." He then told Snow that he was in trouble with the IRS, it "wasn't [her] business or [her] place to be asking," and that they were in a "don't ask, don't tell" business.

Snow also testified that Kelvin's spending habits changed in February 2011 even though the store was not making any more money or conducting any more business than it had before. He bought a house, a Ferrari, and a Range Rover.

IRS Special Agent Dawson testified that New York Gold and Silver Exchange received two suspiciously large deposits wired from Millennium within days after the Karat 22 theft. The first was $1.6 million, wired to the New York Gold and Silver Exchange account three days after the Karat 22 theft, and the

13

second was $1.3 million, wired to the New York Gold and Silver Exchange account several days later. Dawson also testified that Kelvin and John spent a suspicious amount of money after the Karat 22 theft. Kelvin purchased a Ferrari, a Range Rover, a boat, and a nearly $500,000 home with cash. John purchased, among other things, some expensive heavy equipment.

Bryan Vaclavik, the chief fraud examiner for the Harris County District Attorney's Office, testified that New York Gold and Silver Exchange transferred $1.2 million to New York Gold and Jewelry in February 2011, about ten days after the Karat 22 burglary. Kelvin used this money to purchase a Ferrari, a Range Rover, and a home. He also transferred nearly $200,000 to his personal account. Vaclavik testified that the $3 million inflow from Millennium in February 2011 was inconsistent with activity in the account both before and after the deposit of that money.

Vaclavik acknowledged in response to questioning by Kelvin that about $35 million came into the New York Gold and Silver Exchange bank account over the two year period preceding the burglary that appeared to be from legitimate sources. The State argued that by adducing testimony that gave the jury the impression that this $35 million was all derived from legitimate sources, Kelvin opened the door to testimony regarding other extraneous burglaries that could explain the actual, illegitimate source of the funds. On re-direct, Vaclavik testified that the $35

14

million could have come from other burglaries or from legitimate sources. He also testified that the businesses did not report any transactions to the State or the IRS that would explain where the gold that generated the $35 million came from.

***Calls to "Doug" and jailhouse admission***

John was arrested two weeks before Kelvin. During this time, John made calls on a recorded prison line to "Doug," who, an FBI agent testified, was actually Kelvin. The phone calls were played for the jury. Among other things, in the phone calls, John tells "Doug" "I'm talking to this guy who's snitching on us." Kelvin, as "Doug," tells John later "I guess maybe they found some diamond appraisals."

Archie Woods, an inmate who was housed with Kelvin in the Harris County Jail for about five months, testified about conversations that he had with Kelvin about the Karat 22 theft. Woods was in jail for pleading guilty to burglarizing a check cashing business and trying to break into a safe with a hammer. Woods testified that after he told Kelvin about his safe-cracking attempt, Kelvin told Woods that Kelvin, John, and a third man broke in Karat 22 looking for 22-karat gold that could be melted because it was "the best gold you could get." Woods testified that Kelvin said that they entered through the roof, that the alarm was triggered but the owner looked at the surveillance cameras and determined there was no burglary, and that the men proceeded to break into the safe. Kelvin also

told him that they used the third man's truck and that the truck had been caught on video casing the store, which is how the men were caught. Kelvin told Woods that the third man was "telling on them."

On cross-examination, Woods conceded that he had been convicted four times for burglary. Woods testified that he was not offered a deal in exchange for his testimony and that he testified against Kelvin because Kelvin was bragging and trying to game the system.

### *The gemologist's "matching" testimony*

Steven Jarvis, an independent jewelry appraiser, testified that in March 2011, and again in April, Lana Waldon, an employee of New York Gold and Jewelry, brought Jarvis several loose diamonds to appraise. Lana did not ask Jarvis to chart their inclusions, which would have made matching the diamonds with their respective appraisals much easier. Nevertheless, Jarvis testified that eight of the appraisals that he prepared matched diamond certifications for eight gems that had been stolen in the theft.

### *Attempted burglary of Dillon Gage*

After the defense rested, the State called Special Agent M. Aguilar of the FBI as a rebuttal witness. Aguilar testified that, related to his investigation of the Karat 22 burglary, he investigated an attempted rooftop burglary at Dillon Gage, a company in the Dallas area that buys gold and jewelry. The attempted burglary

occurred on February 4, 2011, the night before the Karat 22 burglary and the same day that John bought the ladder from Home Depot.  An extension ladder found in a nearby dumpster after the attempted burglary had the same SKU number as the ladder John bought that day.

*The defensive theories*

Kelvin advanced several defensive theories at trial.  Kelvin argued that he and John were legitimate businessmen and that their money came from the operation of their jewelry stores and John's crane business.  He argued that neither of them was involved in the Karat 22 theft and that instead, it was either an inside job or had been committed by Kennedy and two members of the Mexican Mafia.  Kelvin focused on evidence that a duffle bag containing a Spanish-language newspaper and display boxes belonging to Karat 22 was found several miles south of Karat 22 the day after the theft.

The jury found Kelvin guilty of engaging in organized criminal activity.  The trial court assessed punishment at life in prison.  Kelvin appealed and, at his request, the trial court appointed him appellate counsel.

**The Charge**

In his first two issues, Kelvin argues that his conviction should be reversed because the trial court's charge improperly permitted conviction without jury unanimity and erroneously instructed the jury that he could be convicted of

engaging in organized criminal activity for *conspiring* to commit *burglary* and money laundering, which was not charged in the indictment. The relevant portions of the indictment read:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas that in Harris County, Texas, **KELVIN LYNN O'BRIEN**, hereafter styled the Defendant, heretofore on or about **AUGUST 13, 2007 AND CONTINUING THROUGH APRIL 12, 2013**, did then and there unlawfully, with intent to establish and participate in a combination, and in the profits of a combination, said combination consisting of John O'Brien, Kelvin O'Brien, Chalk O'Brien, Derenda O'Brien and Jason Kennedy, commit the offense of theft in that the Defendant did on or about February 6, 2011, appropriate, by acquiring and otherwise exercising control over property, namely, gold, jewelry, gems and watches owned by C. Patel and Karat 22 Jewelers of the value of over two hundred thousand dollars with the intent to deprive C. Patel and Karat 22 Jewelers of the property.
>
> It is further alleged that in Harris County, Texas, Kelvin Lynn O'Brien, hereafter called the Defendant, heretofore on or about August 13, 2007 and continuing through April 12, 2013, did then and there unlawfully, with intent to establish and participate in a combination, and in the profits of a combination, said combination consisting of John O'Brien, Kelvin O'Brien, Chalk O'Brien, Derenda O'Brien and Jason Kennedy, the Defendant did, knowingly transfer, invest and expend funds which constituted the proceeds of criminal activity, of the value of at least two hundred thousand dollars by purchasing a house, by purchasing a pool, by purchasing motor vehicles, by purchasing a boat, by purchasing a watch, by purchasing heavy equipment, by moving funds from one bank account to another and by paying bondsmen's fees.[1]

---

[1] Chalk O'Brien, John and Kelvin's brother, died before trial and was struck from the indictment.

18

## A. Standard of Review

In analyzing a jury-charge issue, our first duty is to decide if error exists. *See Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g); *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Only if we find error do we then consider whether an objection to the charge was made and analyze for harm. *Tottenham*, 285 S.W.3d at 30; *see also Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) ("The failure to preserve jury-charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary for reversal.").

"The degree of harm necessary for reversal depends upon whether the error was preserved." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Error properly preserved by a timely objection to the charge will require reversal "as long as the error is not harmless." *Almanza*, 686 S.W.2d at 171. The Court of Criminal Appeals has interpreted this to mean that any harm, regardless of degree, is sufficient to require reversal. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). However, when the charging error is not preserved "and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza*, 686 S.W.2d at 171; *see Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) (egregious harm "is a difficult

19

standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial."). Fundamental errors that result in egregious harm are those which affect "the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect his defensive theory." *Almanza*, 686 S.W.2d at 172 (citations and quotations omitted).

When considering whether a defendant suffered harm, the reviewing court must consider: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* at 171. The reviewing court must conduct this examination of the record to "illuminate the actual, not just theoretical, harm to the accused." *Id.* at 174; *see Nava*, 415 S.W.3d at 298 (record must disclose "actual rather than theoretical harm").

## B. Jury Unanimity

In his first issue, Kelvin argues that the charge erroneously permitted the jury to convict him of engaging in organized criminal activity without unanimous agreement about which overt act he committed. Specifically, Kelvin objects that the jury charge presented two enumerated offenses—theft and money laundering—in the disjunctive, and that the State told the jury during closing argument that the

jurors did not have to agree on which enumerated offense the State proved, so long

as all jurors agreed that the State proved one of the two.

**1.      Applicable Law**

Section 71.02(a) of the Texas Penal Code provides that

A person commits [the] offense [of engaging in organized criminal activity] if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more of the following:

(1)      murder, capital murder, arson, aggravated robbery, robbery, burglary, theft, aggravated kidnapping, kidnapping, aggravated assault, aggravated sexual assault, sexual assault, continuous sexual abuse of young child or children, solicitation of a minor, forgery, deadly conduct, assault punishable as a Class A misdemeanor, burglary of a motor vehicle, or unauthorized use of a motor vehicle;

(2)      any gambling offense punishable as a Class A misdemeanor;

(3)      promotion of prostitution, aggravated promotion of prostitution, or compelling prostitution;

(4)      unlawful manufacture, transportation, repair, or sale of firearms or prohibited weapons;

(5)      unlawful manufacture, delivery, dispensation, or distribution of a controlled substance or dangerous drug, or unlawful possession of a controlled substance or dangerous drug through forgery, fraud, misrepresentation, or deception;

(5-a)   causing the unlawful delivery, dispensation, or distribution of a controlled substance or dangerous drug in violation of Subtitle B, Title 3, Occupations Code;

(6)      any unlawful wholesale promotion or possession of any obscene material or obscene device with the intent to wholesale promote the same;

(7) any offense under Subchapter B, Chapter 43, depicting or involving conduct by or directed toward a child younger than 18 years of age;

(8) any felony offense under Chapter 32;

(9) any offense under Chapter 36;

(10) any offense under Chapter 34, 35, or 35A;

(11) any offense under Section 37.11(a);

(12) any offense under Chapter 20A;

(13) any offense under Section 37.10;

(14) any offense under Section 38.06, 38.07, 38.09, or 38.11;

(15) any offense under Section 42.10;

(16) any offense under Section 46.06(a)(1) or 46.14;

(17) any offense under Section 20.05 or 20.06; or

(18) any offense classified as a felony under the Tax Code.

TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2014). Theft and money laundering are two of these enumerated offenses (sometimes also referred to as "overt acts"). *See id.* § 71.02(a)(1) (theft), 71.02(a)(10) (money laundering).

When an indictment alleges several different overt acts, these are alternate means of committing the offense of engaging in organized criminal activity. *Bogany v. State*, 54 S.W.3d 461, 463 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (where indictment for engaging in organized criminal activity alleges

"various overt acts," these are alternate means of committing the offense of engaging in organized criminal activity) (citing *Garcia v. State*, 46 S.W.3d 323, 327 (Tex. App.—Austin 2001, pet. ref'd) ("[T]he various overt acts alleged in the indictment were, in effect, alternate means of committing the offense [of engaging in organized criminal activity].").

"[W]hile jury unanimity is required on the essential elements of the offense, if the statute in question establishes different modes or means by which the offense may be committed, unanimity is generally not required on the alternate modes or means of commission." *Renteria v. State*, 199 S.W.3d 499, 508 (Tex. App.— Houston [1st Dist.] 2006, pet. ref'd) (citing *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006)). Thus, "when alternate theories of committing the same offense are submitted to the jury in the disjunctive, the jury may return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted." *Bogany*, 54 S.W.3d at 463. Accordingly, when an indictment for engaging in organized criminal activity alleges the commission of more than one overt act, jury unanimity is not required with regard to the overt act performed. *Id.*; *see Renteria*, 199 S.W.3d at 508 (indictment alleging engagement in organized criminal activity by theft of cars and theft of money by selling stolen cars alleged a single offense with two means, and jury unanimity was not required with respect to the two types of theft alleged); *Renfro v. State*, 827 S.W.2d 532, 535–36 (Tex.

23

App.—Houston [1st Dist.] 1992, pet. ref'd) (indictment for engaging in organized criminal activity that alleged theft of vehicles, theft of heavy equipment, and theft of money was indictment for single offense, not three separate offenses); *see also Robinson v. State*, No. 01-00-00908-CR, 2002 WL 188466, at *13 (Tex. App.—Houston [1st Dist.] Feb. 7, 2002, no pet.) (when State alleges the defendant engaged in criminal activity by committing one or more overt acts, "the overt acts [are] preliminary fact issues to which jury unanimity is not required").

## 2.    Analysis

We conclude that the trial court did not err in submitting a charge that permitted the jury to convict Kelvin of engaging in organized criminal activity so long as each juror believed beyond a reasonable doubt that "with the intent to establish, maintain, or participate in a combination or in the profits of [the] combination," he had committed either theft or money laundering.

Kelvin argues that the so-called "grammar test" in *Leza v. State*, 351 S.W.3d 344 (Tex. Crim. App. 2011), requires jury unanimity with respect to the enumerated offenses in the engaging in organized crime statute. *Leza* teaches:

> To discern what a jury must be unanimous about, appellate courts examine the statute defining the offense to determine whether the Legislature created multiple, separate offenses, or a single offense with different methods or means of commission. Jury unanimity is required on the essential elements of the offense but is generally not required on the alternate modes or means of commission. Therefore, it is necessary to identify the essential elements or gravamen of an offense and the alternate modes of commission, if any. This is

24

accomplished by diagramming the statutory text according to the rules of grammar. The essential elements of an offense are, at a minimum: (1) the subject (the defendant); (2) the main verb; (3) the direct object if the main verb requires a direct object (i.e., the offense is a result-oriented crime); the specific occasion, and the requisite mental state. The means of commission or nonessential unanimity elements are generally set out in adverbial phrases that describe how the offense was committed. Such phrases are commonly preceded by the preposition "by."

*Id.* at 356–57 (quoting *Pizzo v. State*, 235 S.W.3d 711, 714–15 (Tex. Crim. App. 2007)).

As explained above, section 71.02(a) provides:

A person commits [the] offense [of engaging in organized criminal activity] if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more of the following [enumerated offenses].

TEX. PENAL CODE ANN. § 71.02(a). Applying the grammar test to section 71.02, the subject is "[a] person," the main verb is "commits or conspires to commit," the direct object is "one or more of the following" (the following being the enumerated offenses), and the requisite mental state is "with the intent to establish, maintain, or participate in a combination or in the profits of a combination." TEX. PENAL CODE ANN. § 71.02.

The result of the grammar test as applied to the statute is therefore unclear, because "one or more of the following" could mean that each enumerated offense stands independently as a separate offense, or it could mean that engaging in

25

organized criminal activity is a single offense and the enumerated offenses constitute different manners and means of committing that single offense. Kelvin argues that applying the grammar test to the language in the indictment, however, demonstrates that the enumerated offenses do not constitute the manners and means of committing the offense of engaging in organized criminal activity. The indictment states that Kelvin committed the enumerated offense of theft "*by* acquiring and otherwise exercising control over property . . . owned by" Karat 22 and the enumerated offense of money laundering "*by* purchasing a house, *by* purchasing a pool, *by* purchasing motor vehicles," etc. *Leza* stated that "adverbial phrases" "commonly preceded by the preposition 'by,'" generally set out "[t]he means of commission or nonessential unanimity elements." *Id.* at 357. Thus, he argues, applying the grammar test to the language of the indictment suggests that the enumerated offenses are essential elements of the crime.

However, *Leza* warns against "uncritical[ly]" applying the grammar test, cautioning that while the "grammar test" is "generally useful" and a good "rule of thumb," it "will not necessarily work invariably, in every scenario, to accurately identify legislative intent." *Id.* at 357. *Leza* emphasizes that whether a jury must be unanimous with respect to a particular fact or issue is "primarily a question of legislative intent." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007); *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006)). To

determine the legislature's intent, we look to the statutory text because it provides the best means to determine intent. *See Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011).

*White v. State*, 208 S.W.3d 467 (Tex. Crim. App. 2006) is instructive here. There, the Court of Criminal Appeals examined whether the jury needed to be unanimous in a prosecution for felony murder under Texas Penal Code section 19.02(b)(3), which states:

> A person commits an offense if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2014). White argued that the jury charge violated his right to a unanimous verdict because it authorized the jury to convict him if it unanimously found that he caused the victim's death during the commission of one of two felonies—unauthorized use of a vehicle or evading arrest—without requiring the jury to unanimously find which felony he was committing. *White*, 208 S.W.3d at 468. The Court of Criminal Appeals held that "[t]he term 'felony is clearly an element of Section 19.02(b)(3), thus requiring a jury to unanimously find that the defendant committed a 'felony.'" *Id.* However, the Court of Criminal Appeals held that the jury did not need to unanimously agree regarding which felony the defendant committed, because the two possibilities

simply "constitute[d] the 'manner or means that make up the 'felony' element of Section 19.02(b)(3)." *Id.* The Court of Criminal Appeals noted that its conclusion was bolstered by the fact that "the transitive verb of the portion of Section 19.02(b)(3) at issue here is 'commits' followed by the term 'felony.'" *Id.*

Similarly, in section 71.02, the transitive verb of the portion of section 71.02 at issue here is "commits" followed by the term "one or more of the following," referring to the enumerated offenses. TEX. PENAL CODE ANN. § 71.02(a). If the specific enumerated offense was an essential element of the offense of engaging in organized criminal activity, then the use of the term "one *or more*" would be meaningless, because the commission of each enumerated offense would constitute a separate instance of the offense of engaging in organized criminal activity. Instead, the statute recognizes that the commission of *more than one* enumerated offense results in only a single offense of engaging in organized criminal activity. Moreover, the statute provides that "[i]t is no defense to prosecution under Section 71.02 that:

> (1) one or more members of the combination are not criminally responsible for the object offense;
>
> (2) one or more members of the combination have been acquitted, have not been prosecuted or convicted, have been convicted of a different offense, or are immune from prosecution; [or]
>
> (3) a person has been charged with, acquitted, or convicted of any offense listed in Subsection (a) of Section 71.02[.]

TEX. PENAL CODE ANN. § 71.03(a)(1)–(3). Thus, a person may be convicted of engaging in organized criminal activity *even if* they have been acquitted of committing any enumerated offense. Accordingly, we conclude that in this regard, section 71.02 is analogous to the statute considered by the Court of Criminal Appeals in *White*, and that the enumerated offenses set forth the manners and means by which a person may commit the offense of engaging in organized criminal activity. *See White*, 208 S.W.3d at 468.

This conclusion is consistent with this Court's holdings in *Bogany*, *Renfro*, *Renteria*, and *Robinson*. *See Renteria*, 199 S.W.3d at 508; *Robinson*, 2002 WL 188466, at *13; *Renfro*, 827 S.W.2d at 535–36; *Bogany*, 54 S.W.3d at 463. In all four of those cases, this Court considered whether section 71.02 required unanimity with respect to enumerated offenses and concluded that it did not. We held that an indictment for engaging in organized criminal activity under section 71.02 that alleges more than one overt act alleges alternate means of committing the crime of engaging in organized criminal activity, and that jury unanimity is not required with respect to the particular overt act committed. *See Renteria*, 199 S.W.3d at 508; *Robinson*, 2002 WL 188466, at *13; *Renfro*, 827 S.W.2d at 535–36; *Bogany*, 54 S.W.3d at 463.

Kelvin does not address *Bogany*, where three distinct overt acts were charged—a pretextual arrest by the defendant and his partner, the partner's sale of

29

a purported package of cocaine taken from the arrestee, and the defendant's arrest of another person and sale of a substance that he took from that person and believed to be cocaine. The *Bogany* court held that the "various overt acts alleged were alternate means of committing the offense" of engaging in organized criminal activity. *Bogany*, 54 S.W.3d at 463 (citing *Garcia*, 46 S.W.3d at 327 ("[T]he various overt acts alleged in the indictment were, in effect, alternate means of committing the offense [of engaging in organized criminal activity].")). Conviction under section 71.02 requires proof of the commission of, or conspiracy to commit, only one of the enumerated offenses. *Id.* at 463; *see* TEX. PENAL CODE ANN. § 71.02(a). Thus, the *Bogany* court concluded that where more than one enumerated offense is alleged to have been committed by a defendant charged with engaging in organized criminal activity, the commission of these overt acts is a "preliminary factual issue" about which the jury need not agree, so long as each juror believes that the defendant engaged in organized criminal activity by committing one of the alleged acts. 54 S.W.3d at 463.

Kelvin argues that this case is different from *Renteria* and *Renfro* because the overt acts alleged in those cases were merely different types of theft, whereas here two different types of overt acts were alleged—theft and money laundering. However, neither *Renteria* nor *Renfro* based their analysis on the fact that the different types of overt acts alleged were varieties of theft.

Renfro was charged with engaging in organized criminal activity by collaborating with other individuals to commit "theft of vehicles, heavy equipment, and money." *Renfro*, 827 S.W.2d at 535. The indictment contained eight separate paragraphs alleging eight incidents involving theft of heavy equipment and vehicles, and Renfro argued that the jury charge, which contained the same eight paragraphs from the indictment, failed to adequately apprise him of which offense he had been convicted. *See id.* We held that "[i]n the indictment, the language 'theft of vehicles, heavy equipment and money' did not allege three different offenses, but simply described the purpose of the combination, i.e., to collaborate in carrying on the criminal activity of theft targeting heavy equipment, vehicles, and money." *Id.* at 536. Likewise, here, Kelvin was charged with a single offense of engaging in organized criminal activity, and the two paragraphs of the indictment alleging theft and money laundering simply described the purpose of the criminal combination—to steal gold and jewelry from Karat 22 and to launder the money acquired from selling the stolen gold.

Similarly, Renteria was charged with a single offense of engaging in organized criminal activity. *Renteria*, 199 S.W.3d at 500, 507. The indictment against him alleged in two paragraphs that Renteria participated in stealing 136 vehicles, and in selling the stolen vehicles to 136 innocent purchasers. *Id.* at 500, 507. Renteria argued that because the charge tracked the two paragraphs in the

31

indictment, he could not be sure whether the jury found him guilty for theft of cars or theft of money. *Id.* But we held that "[t]he fact that the State alleged two types of theft did not convert the offense of organized crime into two separate offenses," because these were merely two modes by which Renteria was alleged to have committed the single offense of engaging in organized criminal activity. *Id.*

*Renteria* also considered the sufficiency of the evidence to prove that Renteria intended to participate in a criminal combination and that the alleged members of the combination intended to engage in a continuing course of criminal activity. In connection with that analysis, we stated: "To prove the offense of engaging in organized criminal activity as a party, the State must also prove that the defendant had the mental state required for commission of the underlying offense." *Id.* Kelvin argues that this statement "emphasizes the need for a unanimity instruction" in his case because theft and money laundering have different *mens rea* requirements. But in *Renteria*, the indictment alleged that Renteria had two different objects of his intent—the stealing of cars, and the selling of stolen cars in exchange for money—and yet we nevertheless concluded that jury unanimity was not required with respect to the enumerated offenses because these were "alternate modes or means of commission" of the crime of engaging in organized criminal activity. *See id.* at 508.

Kelvin likewise attempts to distinguish *Robinson* by arguing that there, the indictment alleged *conspiracy* to commit 12 overt acts that included possession of cocaine, delivery of cocaine, and assisting in the delivery of cocaine. Kelvin argues that it is inapplicable because here, the indictment alleged actual *commission* of overt acts. But the analysis in *Robinson* pertaining to jury unanimity regarding overt acts followed our prior opinions and did not turn on the fact that conspiracy, and not commission, was alleged. *See Robinson*, 2002 WL 188466, at *13. *Robinson* held, as did our previous cases, that jury unanimity was not required with respect to overt acts. *Id.*

Kelvin also relies on *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005), to argue that the enumerated offenses of theft and money laundering go to an essential element of the offense of engaging in organized criminal activity. But *Ngo* does not support Kelvin's argument. In *Ngo*, the indictment alleged that Ngo stole a credit card, knowingly received a stolen credit card with intent to use it, and presented a credit card with intent to obtain a benefit fraudulently, knowing that it was not his card and he did not have permission to use it. *Id.* at 745. Texas Penal Code section 32.31 provides:

(b) A person commits an offense [of credit card abuse] if:

(1) with intent to obtain a benefit fraudulently, he presents or uses a credit card or debit card with knowledge that:

(A) the card, whether or not expired, has not been issued to him and is not used with the effective consent of the cardholder;
. . .
(4) he steals a credit card or debit card or, with knowledge that it has been stolen, receives a credit card or debit card with intent to use it, to sell it, or to transfer it to a person other than the issuer or the cardholder . . . .

TEX. PENAL CODE ANN. § 32.31(b)(1)(A), (4). Thus, the statute at issue in *Ngo* did not provide, like the engaging in organized criminal activity statute, that a person commits credit card abuse if a person engages in "one or more" enumerated offenses. TEX. PENAL CODE ANN. § 71.02(a). Instead, the credit card abuse statute defines a number of different actions that each constitute credit card abuse. *See* TEX. PENAL CODE ANN. § 32.31. Thus, the *Ngo* indictment alleged "three statutorily different criminal acts," for which unanimity was required. *See Ngo*, 175 S.W.3d at 745 ("The phrase 'manner or means' describes *how* the defendant committed the specific statutory criminal act.") (emphasis in original). In contrast, here, a single statutory criminal act—engaging in organized criminal activity—is alleged.

In sum, the enumerated offenses in section 71.02 set forth the manners and means by which a person commits the offense of engaging in organized criminal activity. We therefore hold that there was no error in the jury charge because it

properly charged engaging in organized criminal activity by committing theft or money laundering in the disjunctive. *See Renteria*, 199 S.W.3d at 508; *Robinson*, 2002 WL 188466, at \*13; *Renfro*, 827 S.W.2d at 535–36; *Bogany*, 54 S.W.3d at 463; *Garcia*, 46 S.W.3d at 327.

We overrule Kelvin's first issue.

## C. Discrepancy Between Indictment and Abstract Portion of Jury Charge

In his second issue, Kelvin argues that the jury charge erroneously permitted the jury to convict him for engaging in organized criminal activity by *conspiring* to commit burglary and money laundering despite the fact that he was indicted for engaging in organized criminal activity by *committing* theft and money laundering.

### 1. Applicable Law

As previously discussed, section 71.02 provides:

A person commits [the] offense [of engaging in organized criminal activity] if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more of the following [enumerated offenses].

TEX. PENAL CODE ANN. § 71.02(a)(1). "The jury charge may not enlarge the offense alleged and authorize the jury to convict a defendant on a basis or theory permitted by the jury charge but not alleged in the indictment." *Head v. State*, 299 S.W.3d 414, 439 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

35

## 2.    Analysis

The abstract portion of the guilt-stage charge began with the instruction that a "person commits and offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he *conspires* to commit *burglary* or money laundering." (Emphasis added.) Kelvin argues that, because he was indicted only for engaging in organized criminal activity by *committing theft* or money laundering, this error egregiously harmed him by permitting the jury to convict him of engaging in organized criminal activity even if they believed that he did not commit theft or money laundering, so long as they believed that he conspired to commit burglary or money laundering.

The State concedes that it was error to submit the complained-of language, but argues that Kelvin was not egregiously harmed. When, as here, the defendant makes no objection to the complained-of error at trial, he must show that he was egregiously harmed by the error such that it deprived him of a fair and impartial trial. *See Almanza*, 686 S.W.2d at 171 (error creating egregious harm goes to the very basis of case, deprives appellant of valuable right, or vitally affects a defensive theory). To determine whether Kelvin was egregiously harmed, we examine the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the trial record as a whole. *See id.*

36

### The jury charge

Considering the charge in its entirety, the abstract portion of the guilt-stage charge began with the instruction that a "person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he conspires to commit burglary or money laundering." This instruction misstates the offense for which Kelvin was indicted—engaging in organized criminal activity by the *commission* of *theft* or money laundering.

However, this portion of the abstract was not incorporated into the charge's application paragraph. The application paragraph accurately tracked the indictment, which alleged engaging in organized criminal activity by the commission of theft and money laundering, and instructed the jury:

> Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, the defendant, KELVIN LYNN O'BRIEN, heretofore on or about August 13, 2007 and continuing through April 12, 2013, did then and there unlawfully, with intent to establish, maintain or participate in a combination or in the profits of a combination, said combination consisting of Kelvin O'Brien and at least two of the following: John O'Brien and/or Derenda O'Brien and/or Jason Kennedy, commit the offense of theft in that the defendant on or about February 6, 2011 did unlawfully appropriate, by acquiring or otherwise exercising control over property, namely, gold, jewelry, gems and watches owned by C. Patel or Karat 22 Jewelers of the value of over two hundred thousand dollars with the intent to deprive C. Patel or Karat 22 Jewelers of the property then you will find the defendant guilty as charged in the indictment; or
>
> If you find from the evidence beyond a reasonable doubt that in Harris County, Texas, the defendant, KELVIN LYNN O'BRIEN, heretofore on or about August 13, 2007 and continuing through April

12, 2013, did then and there unlawfully, with intent to establish, maintain or participate in a combination or in the profits of a combination, said combination consisting of Kelvin O'Brien and at least two of the following: John O'Brien and/or Derenda O'Brien and/or Jason Kennedy, commit the offense of money laundering, namely in that he heretofore on or about August 13, 2007 and continuing through April 12, 2013, did then and there unlawfully, knowingly transfer, invest or expend funds which constituted the proceeds of criminal activity, of the value of at least two hundred thousand dollars by purchasing a house, by purchasing a pool, by purchasing motor vehicles, by purchasing a boat, by purchasing a watch, by purchasing heavy equipment, by moving funds from one bank account to another or by paying bondsmen's fees, then you will find the defendant guilty as charged in the indictment.

"It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012) ("An abstract charge on a theory of law that is not applied to the facts does not authorize the jury to convict upon that theory."). Because the application paragraph tracked the indictment, it "restricted the jury's consideration to only those allegations contained in the [indictment]." *Id.* at 467 (jury is presumed to have understood and followed court's charge, absent evidence to the contrary).

Nothing in the record suggests that the jury did not properly apply the application paragraph. Therefore, the charge itself does not point toward finding egregious harm. *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) ("Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious."); *see also Crenshaw*, 378 S.W.3d at 464–66 ("Generally, reversible error occurs in the giving of an abstract instruction only

38

when the instruction is an incorrect or misleading statement of a law that the jury must understand in order to implement the commands of the application paragraph.").

*The evidence*

The evidence throughout the trial focused on whether Kelvin actually committed the Karat 22 theft and laundered stolen money from that theft. Kennedy testified that he committed the Karat 22 theft with Kelvin and John, describing how the men entered through the roof, disarmed the alarm, cut through the vault, emptied it, and carried bags and bins full of jewelry to Kennedy's truck. Woods testified that Kelvin told him that he had committed the Karat 22 theft by entering the vault and that Kennedy's truck led to them being caught. The jury saw several surveillance videos showing some of the events described by Kennedy. The State also introduced phone records consistent with Kennedy's testimony showing that John called Derenda on the way to Dallas from Karat 22 and alarm records showing that their store's alarm was disarmed shortly thereafter. The jury heard recordings of jailhouse phone calls between John and Kelvin in which the two men mention that Kennedy was "snitching" on them and that law enforcement found diamond appraisals. The diamond appraisals themselves—apart from Jarvis's testimony—revealed strikingly similar specifications to Karat 22's certifications of the diamonds that were stolen by the thieves. The evidence

39

showed that Kelvin received about $1.2 million from the gold sold shortly after the Karat 22 theft, and he used it to buy a number of things with cash, including a home and cars.

The evidence thus strongly connects Kelvin with the Karat 22 theft and the subsequent money laundering. Moreover, the evidence was all directed towards demonstrating that Kelvin, as part of the criminal combination, actually committed the Karat 22 theft and laundered the stolen money.

### Arguments of counsel

Neither party's counsel focused the jury's attention on the erroneous statement. The State did not argue that Kelvin should be convicted based on conspiracy to commit burglary or money laundering. Instead, the State argued that Kelvin should be convicted because, in furtherance of the criminal combination, he committed the Karat 22 theft and laundered the stolen money, which is consistent with the indictment and the application paragraph of the charge.

In sum, nothing in our review of the record rebuts the presumption that the jury understood and followed the application paragraph or suggests that the jury was confused or misled by the error in the abstract. *See Crenshaw*, 378 S.W.3d at 467. We hold, therefore, that Kelvin was not egregiously harmed by the inclusion of the erroneous language in the abstract. *See Medina*, 7 S.W.3d at 640 ("[w]here

40

the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious").

We overrule Kelvin's second issue.

**Extraneous Offenses**

In his third issue, Kelvin contends that the trial court erred in admitting evidence of three extraneous offenses—burglaries at Nazar's and an unnamed Austin store, and the attempted burglary at Dillon Gage. The State contends that Kelvin did not preserve error regarding the admission of this evidence. But even if this issue was preserved and we were to conclude that the trial court erred in admitting evidence of these extraneous burglaries, any error in the admission of such evidence would be harmless in light of the evidence regarding the Cox's Jewelry burglary, about which Kelvin does not complain on appeal. *See* TEX. R. APP. P. 44.2(b) (non-constitutional error must be disregarded unless it affects a substantial right).

The testimony regarding Nazar's, the unnamed Austin store, and Dillon Gage was minimal. Kennedy testified that he helped John and Kelvin burglarize jewelry stores to steal jewelry "about four times," including Nazar's and an unnamed Austin store. Agent Aguilar testified that he investigated a February 4, 2011 attempted rooftop burglary at Dillon Gage, and found an extension ladder left

behind after the attempted burglary in a nearby dumpster that had the same SKU number as the ladder John bought at Home Depot earlier that day.

In contrast, a significant amount of testimony was adduced regarding the burglary and theft from Cox's Jewelry. Daniel Cox, its owner, testified that his store was burglarized in August 2007. Thieves cut through his steel and concrete safe with a grinding disk and stole $225,000 worth of jewelry. The thieves gained access to the store by crawling through the adjoining store's air conditioning vent into the attic and disarming the alarm system. Cox was later able to identify four diamonds that were stolen that night that had been sold to a man named Mike Follett in August 2007. Martin Adams, a former employee of Follett, testified that Kelvin sold diamonds to Follett that same month.

Officer A. Householder of the Mansfield Police Department testified that law enforcement arrested Chalk O'Brien, Kelvin and John's brother, sitting in a car facing Cox's Jewelry around 3:00 a.m. on the night of the burglary. Householder eventually determined that Chalk was acting as a lookout and suspected that John and Kelvin were also involved in the burglary. Householder talked to Follett about the diamonds that Kelvin sold to Follett in August 2007, and brought Cox to Follett's store, where Cox identified the diamonds as belonging to Cox's Jewelry. Householder obtained and executed a search warrant to search Kelvin's home,

where he found diamonds laying on the floor and other evidence that jewelry had been dismantled. He also found gloves, cut-off wheels, and a magnetic drill.

The evidence regarding the complained-of extraneous offenses was minimal—a few lines or pages of testimony at most—compared to the evidence regarding the Cox's burglary, which involved several witnesses and significant amounts of testimony regarding the manner in which the burglary was conducted, which was similar to the Karat 22 burglary, and Kelvin's involvement. *See Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove."). The evidence of the other burglaries was essentially duplicative, albeit far less detailed, of the Cox's burglary evidence. Accordingly, we hold that even if the trial court erred in admitting evidence of the complained-of extraneous offenses, any error in its admission was harmless. *See id.*

We overrule Kelvin's third issue.

### Jarvis's Testimony

In his fourth issue, Kelvin argues that the trial court erred by allowing Jarvis to testify that he had a "high degree of certainty" that the diamond appraisals he prepared for Kelvin matched Karat 22's certifications of stolen diamonds because this testimony did not meet the standard for expert testimony set forth in *Kelly v.*

*State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), and *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998), *overruled on other grounds*, *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

## A.    Standard of Review and Applicable Law

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  TEX. R. EVID. 702. Before admitting expert testimony, a trial court must determine that (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case.  *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).  Thus, the trial court must determine that the expert is qualified to testify and the proffered testimony is reliable and relevant.  *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).  The Court of Criminal Appeals set forth the test for assessing the reliability of expert testimony concerning "hard sciences" in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992) and "soft sciences" (opinions based on experience or training as opposed to the scientific method) in *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998), *overruled on other grounds*, *State*

*v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).  *See Petricolet v. State*, 442 S.W.3d 643, 651 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

But even if the trial court errs in admitting expert testimony, this error is non-constitutional and requires reversal only if it affects the substantial rights of the accused.  *See* TEX. R. APP. P. 44.2(b) (non-constitutional error must be disregarded unless it affects a substantial right); *Petricolet*, 442 S.W.3d at 653.  "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict."  *Petricolet*, 442 S.W.3d at 653 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)).  "We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect."  *Id.* at 654 (*Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011)).

In order to ascertain the effect the wrongfully admitted evidence may have had on the verdict, we review the entire record.  *Barshaw*, 342 S.W.3d at 93. Factors that we may consider include (1) the strength of the evidence of the appellant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's

testimony during argument. *Petricolet*, 442 S.W.3d at 654 (citing *Coble v. State*, 330 S.W.3d 253, 286–88 (Tex. Crim. App. 2010)).

## B.     The Testimony

Jarvis testified that he had an associate's degree in jewelry store management and a Graduate Gemologist degree from the Gemological Institute of America. He worked in the jewelry industry for 25 years before obtaining his GIA degree. To earn his GIA degree, Jarvis took gemology courses, completed work study and lab programs, and took an extensive exam. He then opened his own appraisal business in 2004.

Jarvis testified that gem appraisers look at the "four C's"—cut, color, clarity, and carat weight. He explained the process for appraising loose diamonds, which includes documenting the attributes, grading the color, clarity, proportions, and finish, and determining the value. Jarvis uses several instruments when appraising diamonds, including a gem scale to determine weight, a gem scope to determine clarity, and a micrometer for millimeter gauge to measure diameter and depth. Jarvis explained that the gem scale is extremely sensitive—it is contained in a glass box because even a breeze can affect the weight by "half a point or .005 carats." He explained that there are different qualities of scales and different levels of calibration and accuracy, depending on the price of the scale, and that the quality of the scale varies widely by appraiser and by how often and precisely it is

calibrated. He testified that the same is true for micrometers. Jarvis also explained that to determine color, he puts a stone up against a diamond light and also uses a colorimeter. He also sometimes consults his assistant gemologist for a second opinion.

Jarvis noted that assessments of clarity and color, as well as proportions and finish, may vary from appraiser to appraiser because they involve judgment calls. Jarvis testified that he would be surprised if two GIA-certified appraisers produced identical appraisals, because there are judgment calls that go along with the measurements conducted. Jarvis also testified that there are other entities, such as the European Gemological Laboratory ("EGL"), that issue appraisals and diamond certifications. According to Jarvis, the GIA is the most conservative and accurate in grading, and EGL is more liberal in its grading and not as accurate. Carat weight and measurements are typically fairly close in a comparison of a GIA and an EGL appraisal, but the clarity could be off a grade or two, and the color could be off by two to three or as much as five grades.

Jarvis testified that he had conducted diamond appraisals for Kelvin's store, New York Gold and Jewelry in the past. In March 2011, and again in April, Lana Waldon, an employee of New York Gold and Jewelry, brought Jarvis several loose diamonds to appraise. All of the diamonds weighed over one carat each. Lana did

not ask Jarvis to chart them for inclusions, which would have made the diamonds much easier to identify in the future.

Karat 22 had about 15 certifications for diamonds that it had in inventory at the time of the theft. Jarvis compared the dimensions on one of the appraisals that he prepared for New York Gold and Jewelry to a Karat 22 EGL certification for one of its diamonds and testified that the measurements differed by only hundredths of a millimeter. He also testified that he evaluated the proportions of the diamond as "very good" and that the EGL certification had measurements consistent with a very good proportion diamond. Both documents listed the diamond's finish as very good. The EGL certification graded the stone as a K, and Jarvis's appraisal graded the stone as an M. Jarvis testified that it would not be unusual for a GIA appraisal to grade the same stone two grades lower in color than an EGL certification.

The State then asked Jarvis whether he could say that the appraisal and the certification were of the same diamond. Kelvin objected that Jarvis was not qualified to testify regarding appraisal matching and that appraisal matching was not a recognized methodology. The trial court held a hearing outside the presence of the jury to determine whether Jarvis's opinion that he had a "high degree of certainty" that eight of the appraisals were of the same stone as eight of the Karat 22 certifications was sufficiently reliable. During the hearing, Jarvis testified,

among other things, that he does not regularly compare appraisals and that it is not a regular practice in gemology to compare appraisals for identification purposes. Jarvis also testified that he was not specifically trained to compare appraisals, that comparison of appraisals is not something that is taught in the field of gemology, and that gemology does not have set standards for the level of certainty required when comparing appraisals. Following the hearing, the trial court determined that Jarvis was qualified as an expert to state his opinion that he had a "high degree of certainty" that the appraisal and the certification were of the same stone.

Jarvis testified, in front of the jury, that he had a high degree of certainty that the appraisal and the certification were of the same stone, but that he was not 100% certain that they were the same. He testified that he followed similar appraisal procedures with respect to seven other diamonds brought to him from New York Gold and Jewelry in March and April 2011, and after comparing those appraisals to seven Karat 22 certifications, testified that he had a high degree of certainty that each of these seven matched a certification obtained from Karat 22.

On cross-examination, Jarvis acknowledged that New York Gold and Jewelry had him appraise 14 stones in March and April, but that the State only asked him to compare eight of the appraisals he prepared to Karat 22 certifications. He also admitted that there were slight differences in measurements in each of the appraisals that he had concluded were likely matches, and that the color, clarity,

and weight differed slightly between many of the compared appraisals. He acknowledged that there were likely other diamonds that existed that closely matched the specifications in the Karat 22 certifications. He admitted that one certification indicated that diamond had a chip, and that the matching appraisal did not indicate a chip, even though he would have noted a chip had he seen it. He also admitted another certification showed an internally flawless diamond, but that he had measured the "matching" diamond at a lower clarity. He stated that this was the comparison that he was "most concerned about" and that it might not be the same stone, even though he testified that he had a high degree of certainty that it matched. He also admitted that one of the Karat 22 certifications said the diamond had a blue fluorescence, and he had marked the "matched" diamond as having yellow fluorescence, but testified that it was likely due to differences in equipment. Jarvis acknowledged that the best way to compare the diamonds would be to actually look at the diamonds themselves.

## C. Analysis

### 1. Did the trial court err by allowing Jarvis to testify that he had a "high degree of certainty" that the appraisals and the certifications matched?

We conclude that the trial court erred by allowing Jarvis to testify that he had a "high degree of certainty" that the appraisals and the certifications matched, or were of the same diamonds, because this opinion was not sufficiently reliable.

Whether analyzed under *Kelly* or *Nenno*, "reliability should be evaluated by reference to the standards applicable to the particular professional field in question."[2] *Petricolet*, 442 S.W.3d at 653 (quoting *Coble*, 330 S.W.3d at 274). Jarvis testified that he does not regularly compare appraisals, that it is not a regular practice in gemology to compare appraisals for identification purposes, that he was not specifically trained to compare appraisals, that comparison of appraisals is not something that is taught in the field of gemology, and that gemology does not have set standards for the level of certainty required when comparing appraisals. Thus, by Jarvis's own admission, there are no standards within gemology that would permit a determination regarding whether his testimony was reliable. "When a witness's methodology and conclusions cannot be validated or have been 'otherwise inadequately tested,' the proposed testimony is characterized as 'junk science.'" *Id.* (quoting *Coble*, 330 S.W.3d at 274). Here, the State presented no evidence validating Jarvis's comparison methodology and conclusions; to the contrary, the evidence shows that the comparison methodology could not be independently validated. Accordingly, we hold that the trial court erred in admitting Jarvis's matching testimony. *See id.* (trial court erred in admitting expert

---

[2] The State argues in the alternative that Jarvis's matching testimony was merely opinion testimony by a lay witness because Jarvis simply told the jury things that they could see for themselves in the appraisal and certification documents. *See* TEX. R. EVID. 701. But Jarvis did not simply compare the measurements in the appraisals and certifications—he also opined regarding the meaning of those measurements.

testimony where State presented no evidence validating expert's method and conclusions).

### 2.    Was Kelvin harmed by the admission of the matching testimony?

We conclude that, although the trial court erred in allowing Jarvis to testify that his appraisals matched Karat 22's certifications, the admission of this testimony "did not have a substantial and injurious effect or influence in determining the jury's verdict." *See Petricolet*, 442 S.W.3d at 653.

The evidence of Kelvin's involvement in the Karat 22 theft and money laundering was substantial. It included, among other things, Kennedy's testimony, the surveillance videos, the phone records showing that John called Derenda at the time Kennedy testified that he did, and the alarm records showing that the store's alarm was deactivated as Kennedy testified. It also included recordings of phone calls between John and Kelvin in which they discussed the theft and that a third man was "snitching" on them, as well as Woods's testimony that Kelvin told him that he committed the Karat 22 theft. The State also traced the flow of funds from Millennium to Kelvin and showed how he used the money to purchase a house and cars, among other things.

Kelvin argues that Jarvis's testimony affected his substantial rights because it "was the only source of matching and linking the diamonds" to him. But this overlooks the recorded phone call between John and Kelvin in which Kelvin said

"I guess maybe they found some diamond appraisals." Thus, Kelvin's own statement suggested to the jury that the diamond appraisals were some proof connecting Kelvin to the Karat 22 theft.

Kelvin argues that Jarvis's opinion was "very strong," because he testified that the diamonds were a match with a "high degree of certainty." But Kelvin adduced a number of concessions that weakened Jarvis's testimony in the eyes of the jury. For example, Jarvis acknowledged that he appraised 14 stones for New York Gold and Jewelry shortly after the theft, but that he was only asked to review eight of the appraisals. He also admitted that it would be possible to find other diamonds matching the specifications in the Karat 22 certifications. Jarvis admitted that one certification indicated that the diamond had a chip, and that the purportedly matching appraisal did not, even though he would have noticed a chip had he seen it. He also admitted that another certification showed an internally flawless diamond, but that he had measured the purportedly matching diamond as a VS1. He admitted that he still said that he had a "high degree of certainty" that this stone was a match even though it might not be the same stone. Jarvis acknowledged that the best way to compare the diamonds would be to actually look at the diamonds themselves, and admitted to numerous other discrepancies between the appraisals and the certifications.

In closing, the State told the jury that the matching diamonds was one of the things that connected Kelvin to the Karat 22 theft. However, the State did not discuss Jarvis's testimony extensively and mentioned the matching as only one of a number of things that tended to connect Kelvin to the theft. The matching of the diamonds was not a central theme of the State's closing.

In sum, Jarvis's "matching" testimony was just one piece of a substantial amount of evidence connecting Kelvin to the Karat 22 theft, evidence was adduced suggesting that Kelvin himself believed the diamond appraisals connected him to the Karat 22 theft, Jarvis's testimony was effectively refuted on cross-examination, and the State did not rely heavily upon the matching testimony in its jury argument. After considering the relevant factors in light of the entire record, we conclude that the admission of Jarvis's "matching" testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Coble*, 330 S.W.3d at 268; *see Barshaw*, 342 S.W.3d at 93. Accordingly, we hold that any error in the admission of Jarvis's "matching" testimony does not warrant reversal. *See* TEX. R. APP. P. 44.2(b); *Petricolet*, 442 S.W.3d at 653.

We overrule Kelvin's fourth issue.

## Self-Representation

In his fifth issue, Kelvin contends that the trial court abused its discretion in granting his request to represent himself because (1) his assertion of the right to

54

self-representation was equivocal and contingent upon being granted a continuance, and (2) the request was made mid-trial.

## A. Standard of Review

"We review the factual issue of whether a defendant has clearly and unequivocally invoked the right to self-representation for an abuse of discretion." *Duren v. State*, 01-13-00103-CR, 2014 WL 5500482, at *4 (Tex. App.—Houston [1st Dist.] Oct. 30, 2014, pet. ref'd) (mem. op.; not designated for publication) (citing *DeGroot v. State*, 24 S.W.3d 456, 457–58 (Tex. App.—Corpus Christi 2000, no pet.). In conducting our review, we view the evidence in the light most favorable to the trial court's ruling. *Id.*

## B. Applicable Law

The Sixth Amendment of the federal constitution guarantees both the right to counsel and the corresponding right to self-representation. *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975); *Hathorn v. State*, 848 S.W.2d 101, 122–23 (Tex. Crim. App. 1992); TEX. CODE CRIM. PROC. ANN. art. 1.05 (West 2005) (recognizing right of accused to be heard by himself, through counsel, or both); *Carroll v. State*, 176 S.W.3d 249, 256 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). Once a defendant unequivocally asserts the right to self-representation, the trial court must admonish the defendant about the dangers and disadvantages of waiving the right to counsel and proceeding pro se. *Blankenship*

*v. State*, 673 S.W.2d 578, 583 (Tex. Crim. App. 1984) (citing *Faretta*, 422 U.S. at 835–36, 95 S. Ct. at 2541). "[T]he right to self-representation does not attach until it has been clearly and unequivocally asserted." *Williams v. State*, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008) (quoting *Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986)); *see also Luken v. State*, No. 01-98-00602-CR, 1999 WL 442181, at *1 (Tex. App.—Houston [1st Dist.] July 1, 1999, no pet.) ("An accused should be allowed to represent himself so long as the assertion of his right to self-representation is unconditional and is asserted without delay or disruption to the proceedings.").

A defendant must make a decision to waive counsel competently, voluntarily, knowingly and intelligently. *Godinez v. Moran*, 509 U.S. 389, 400, 113 S. Ct. 2680, 2687 (1993); *Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541. A decision to waive counsel and represent oneself is made voluntarily, knowingly and intelligently if it is made with a full understanding of the right to counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation. *Moore v. State*, 999 S.W.2d 385, 396 (Tex. Crim. App. 1999). The trial court need not follow formulaic questioning or a particular script in ascertaining whether the defendant's waiver is competent, voluntary, knowing, and intelligent, but if it is not otherwise apparent from the record, the trial court should inquire regarding the defendant's background, age, experience, and education. *See*

*Burgess v. State*, 816 S.W.2d 424, 428 (Tex. Crim. App. 1991); *see also Johnson v. State*, 760 S.W.2d 277, 278 (Tex. Crim. App. 1988). The trial court should also inform the defendant that "there are technical rules of evidence and procedure, and he will not be granted any special consideration solely because he asserted his pro se rights." *Johnson*, 760 S.W.2d at 279. "To assess whether a waiver is effective, courts consider the totality of the circumstances." *Williams*, 252 S.W.3d at 356.

## C.    Analysis

Kelvin does not contend that the trial court failed to properly admonish him regarding the dangers and disadvantages of self-representation. Instead, Kelvin argues that the trial court abused its discretion because (1) his request to represent himself was not unequivocal and (2) he made the request mid-trial.

### 1.    Kelvin's request to represent himself was unequivocal.

Kelvin argues that his request to represent himself was "conditioned upon a request for a continuance to allow him time to adequately research his case." He argues that the trial court abused its discretion in permitting him to represent himself because his request was not unequivocal.

We conclude that the trial court did not abuse its discretion in finding that Kelvin had unequivocally invoked his right to self-representation. A week into trial, Kelvin asked the trial court to allow him to represent himself. The trial court recessed trial to permit Kelvin to discuss his request with his appointed trial

counsel. The trial court then admonished Kelvin regarding the dangers and disadvantages of self-representation and inquired into Kelvin's background, age, experience, and education. The trial court repeatedly confirmed that Kelvin understood that he would be held to the same standard as a lawyer and would be at a disadvantage because he did not have legal training. Then the trial court told him, "[W]e are in the middle of a lengthy matter and this case is going to proceed. You understand that?"

> Kelvin: I understand.
>
> The Court: It's 3:15 in the afternoon. Is there anything any additional time would help you in making this decision, or do you need any further time to reflect on this decision—
>
> Kelvin: No, sir.
>
> The Court: —before we bring the jury out and go forward?
>
> Kelvin: Ready to go forward.
>
> The Court: All right. And just for the record, I've given you about a half hour or so, maybe a little bit more, to talk with Mr. Still and Mr. Bunin and to think about this decision; is that correct?
>
> Kelvin: Yes, sir.
>
> The Court: And you're not asking for any additional time?
>
> Kelvin: No, sir.

The trial court then reviewed a document labeled "Faretta Warnings, Waiver of Court-Appointed Counsel, Court Findings and Order Allowing Defendant to

Proceed Pro Se" with Kelvin, admonished him further, and confirmed that Kelvin understood all of the warnings and the written waiver. After reviewing this document and telling Kelvin that he could sign the document if he was sure that he wanted to represent himself, the trial court told Kelvin:

> Once again, Mr. O'Brien, if you want even for the rest of the day, to have a chance to think about this, even over the evening, I'll give you additional time to reconsider this decision. Do you wish to have that additional time?

> Kelvin: No, sir.

Kelvin then signed the written waiver of his right to counsel.

The next morning, trial reconvened, and the trial court confirmed once more with Kelvin that he wished to represent himself.

> The Court: Mr. O'Brien, I wanted to be clear for the record. Yesterday we did take a break during the course of the trial. I gave you time to visit with Mr. Still and Mr. Bunin with regard to your—I know we took probably a 45-minute break or so with regard to that. I know for some period of time you had a chance to visit with Mr. Still and Mr. Bunin. Is it still your decision today to continue to represent yourself?

> O'Brien: Yes, sir.

> The Court: All right.

Kelvin told the trial court that he wanted to discuss several matters. He first indicated that he wanted to subpoena certain records, and the trial court told him to file any subpoena requests with the clerk. Kelvin then raised an issue regarding the Cox's burglary.

Kelvin: Also, Your Honor, I'd like to request, beings as I was charged with the Cox burglary on short notice and—basically, I feel like I was just charged with this crime yesterday, I need time to work on this case. I need discovery. I'd like to request full discovery, exculpatory evidence, everything related to this case.

The Court: Everything related to that that's in the possession of the DA's Office with regard to that, we'll make sure that anything that is in their possession is made available to you.

Kelvin: Okay.

The Court: What in particular are you asking for?

Kelvin: Exculpatory evidence, police reports.

The Court: They're under a continuing order to provide any exculpatory evidence.

Kelvin: Okay. And you may object to this, but I feel like I need time to research the case. I was just charged with it yesterday—

The Court: No.

Kelvin: —and I'm facing 20 years in—

The Court: The case was in the indictment. That allegation was actually contained in the indictment, which at your attorney's request and your request, I actually severed out of the indictment in your charge. There was notice of it that it would be potentially used against you and the State would attempt to use that as an extraneous matter.

Kelvin argues that this exchange shows that his "invocation of his right to represent himself . . . was conditioned upon a request for a continuance to allow him time to adequately research his case," and that the trial court thus "had a duty to deny [his] request to represent himself once it became apparent that it was

60

conditional." Kelvin relies upon *Scarbrough v. State*, 777 S.W.2d 83 (Tex. Crim. App. 1989) to argue that, where a defendant makes his request to represent himself conditional upon being granted additional access to legal resources, a trial court concerned about delay should deny the request and then ascertain whether the defendant "persists in his request for self representation" despite the denial. *Id.* at 93.

But Kelvin's characterization of the events surrounding his request to represent himself is incorrect. Kelvin's request to represent himself was not conditioned upon being granted extra time. Kelvin requested a continuance to conduct research and discovery regarding the Cox's burglary *after* he had waived his right to counsel and repeatedly reaffirmed that he wanted represent himself. Moreover, in context, it is clear that Kelvin was asking for more time to research issues related to the Cox's burglary—an extraneous offense, the admission of which is unchallenged on appeal—and not the primary charge. The trial court correctly noted that this offense was included in Kelvin's indictment. In addition, before the trial court permitted Kelvin to represent himself, the trial court repeatedly admonished Kelvin that he was going to be at a disadvantage if he represented himself and told him that invoking his right to self-representation would not be a basis for delaying the trial because "we are in the middle of a lengthy matter and this case is going to proceed."

Viewing the evidence in the light most favorable to the trial court's ruling, as we must, we hold that the trial court did not abuse its discretion in determining that Kelvin unequivocally invoked his right to self-representation. *See Duren*, 2014 WL 5500482, at *4 (court reviews factual issue of whether defendant has unequivocally invoked the right to self-representation for an abuse of discretion viewing evidence in light most favorable to trial court's ruling).

## 2. The trial court did not abuse its discretion by granting Kelvin's request mid-trial.

Kelvin argues that the trial court abused its discretion in granting his request to represent himself because trial had already begun. He argues that the trial court erred because "[o]n the seventh day of a complex first-degree felony trial, [he] should not have been permitted to represent himself." Kelvin notes, correctly, that to be considered timely, the right to self-representation must be asserted before the jury is empaneled. *See, e.g.*, *McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997). Kelvin acknowledges that the trial court nevertheless has discretion to allow a defendant to represent himself after trial has begun. *See Hernandez v. State*, No. 01-07-00739-CR, 2008 WL 3522256, at *3 (Tex. App.—Houston [1st Dist.] Aug. 14, 2008, no pet.). However, he relies upon *Blankenship v. State*, 673 S.W.2d 578 (Tex. Crim. App. 1984), to argue that the trial court abused its discretion in permitting him to invoke his right to self-representation mid-trial. In *Blankenship*, the Court of Criminal Appeals stated

> This Court requires no formulaic questioning to establish a knowing and intelligent waiver nor will it author a script for courtroom recitation by trial judges faced with this dilemma. On the other hand, *Faretta* does not authorize trial judges across this state to sit idly by doling out enough legal rope for defendants to participate in impending courtroom suicide; rather, judges must take an active role in assessing the defendant's waiver of counsel.

*Id.* at 583. Kelvin appears to be arguing that the trial court "dol[ed] out enough legal rope" to permit him to commit "courtroom suicide" by permitting him to invoke the right to self-representation mid-trial. *Id.*

But *Blankenship* does not stand for the proposition that a trial court that permits a defendant to represent himself mid-trial necessarily abuses its discretion. Instead, *Blankenship* merely emphasizes that the trial court should actively determine whether the defendant's waiver is knowing and intelligent. Kelvin does not argue that the trial court did not properly admonish him or actively seek to determine that his waiver was knowing and intelligent. As discussed above, the record reflects that the trial court admonished Kelvin and repeatedly confirmed that Kelvin understood the consequences of invoking the right to self-representation mid-trial, including that he would not be entitled to claim ineffective assistance from that point on and might waive objections and points of error that his lawyer would otherwise preserve. And *Blankenship* recognizes that the decision to invoke the right to self-representation may be unwise, but that is not grounds for denying the request.

> [D]efendants who insist that they neither need nor want assistance in rebutting the prosecution's claim have made an unsagacious choice. It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. *But* the right to defend is personal. It is the defendant, not his lawyer or the State, who will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. While we may be skeptical of his election knowing that he may conduct his defense ultimately to his own detriment, his choice must be honored.

*Id.* at 583. Kelvin's argument amounts to a claim that the trial court should have denied his request because the decision to represent himself mid-trial was unwise. But that is not a basis for finding that the trial court abused its discretion in granting the request. *See id.* Accordingly, we hold that the trial court did not abuse its discretion by granting Kelvin's request mid-trial. *See id.*

Because we have concluded that the trial court did not err in permitting Kelvin to represent himself, we do not address his related argument that the trial court's alleged error in granting the request is not subject to a harm analysis.

We overrule Kelvin's fifth issue.

**Conclusion**

We affirm the trial court's judgment.

Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

Publish.  TEX. R. APP. P. 47.2(b).